Walter J. HICKEL, Governor of the State of Alaska, Darrel J. Rexwinkel, Commissioner of the Alaska Department of Revenue, and the State of Alaska, Appellants and Cross–Appellees,

v.

Rick HALFORD, President of the Alaska State Senate, Drue Pearce, Steve Frank, Bert Sharp, Mike Miller, Randy Phillips, Tim Kelly, Loren Leman, George Jacko, Steve Rieger, and Robin Taylor, comprising the Senate Majority of the Eighteenth Alaska Legislative Session, Appellees and Cross–Appellees,

and

Steve Cowper, Appellee and Cross–Appellant.

Nos. S–6124, S–6134.

Supreme Court of Alaska.

April 4, 1994.

As Amended on Limited Grant of Rehearing April 18, 1994.

172

Jenifer A. Kohout, Stephan C. Slotnick, Asst. Attys. Gen., and Bruce M. Botelho, Atty. Gen., Juneau, for appellants and cross-appellees Hickel, et al.

G. Kent Edwards, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellees and cross-appellees Halford, et al.

Douglas Pope, Wagstaff, Pope & Katcher, Anchorage, for appellee and cross-appellant Cowper.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J., Pro Tem.*

## OPINION

MATTHEWS, Justice.

This case requires us to interpret article IX, section 17 of the Alaska Constitution, which establishes the budget reserve fund.[1]

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. Article IX, section 17 provides as follows:

   **Budget Reserve Fund.** (a) There is established as a separate fund in the State treasury the budget reserve fund. Except for money deposited into the permanent fund under Section 15 of this article, all money received by the State after July 1, 1990, as a result of the termination, through settlement or otherwise, of an administrative proceeding or of litigation in a State or federal court involving mineral lease bonuses, rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments or bonuses, or involving taxes imposed on mineral income, production, or property, shall be deposited in the budget reserve fund. Money in the budget reserve fund shall be invested so as to yield competitive market rates to the fund. Income of the fund shall be retained in the fund. Section 7 of this article does not apply to deposits made to the fund under this subsection. Money may be appropriated from the fund only as authorized under (b) or (c) of this section.

   (b) If the amount available for appropriation for a fiscal year is less than the amount appropriated for the previous fiscal year, an appropriation may be made from the budget reserve fund. However, the amount appropriated from the fund under this subsection may not exceed the amount necessary, when added to other funds available for appropriation, to pro-

The voters adopted article IX, section 17 in the 1990 general election. It was placed on the ballot after being passed by a legislative resolution approved by a two-thirds vote of each house of the 1990 legislature.

Section 17 requires deposit into the budget reserve fund of all money received by the State after July 1, 1990, "as a result of the termination, through settlement or otherwise, of an administrative proceeding or of litigation ... involving mineral lease bonuses, rentals, royalties ... or involving taxes imposed on mineral income, production, or property...." § 17(a). Appropriations from the fund require a super legislative majority, i.e., three-fourths of each house. § 17(c). However, if the amount available for appropriation for a given fiscal year is less than the amount appropriated for the previous fiscal year, an appropriation from the budget reserve fund can be made by a majority vote of each house of the legislature. Such an appropriation is limited to the difference between the amount available for appropriation for the fiscal year and the amount appropriated "in the previous calendar year for the previous fiscal year." § 17(b).

The primary issue in this case is the meaning of the term "administrative proceeding" as used in article IX, section 17(a) with respect to mineral taxes. The dispute can only be understood in the context of the applicable statutory and administrative procedures for collection of such taxes.

For all taxes, the tax collection process begins with the filing of the return by the taxpayer. Oil and gas production returns must be filed monthly. AS 43.55.020–.030. Income tax returns must be filed annually. AS 43.20.030. Payments of taxes due must accompany the tax returns. See AS 43.20.-030; AS 43.55.020. The oil and gas audit division generally audits all taxpayers for all tax periods, with a single audit covering from one to three years, or twelve to thirty-six tax periods. The income and excise audit division also generally audits every oil and gas return filed under AS 43.20. When an audit is complete, the taxpayer is notified of any deficiency by a notice of assessment and demand for payment (hereinafter referred to as the assessment). This is provided for in AS 43.05.245. Assessments must be issued within three years after a return is filed or collection is barred. AS 43.05.260(a).

When a taxpayer receives an assessment, the taxpayer is presented with a number of choices. It may pay the taxes in accordance with the assessment; it may appeal the assessment within sixty days by filing a request for appeal under AS 43.05.240 and 15 AAC 05.010; or it may do nothing. If the taxpayer does nothing, the Department of Revenue (DOR), after the sixty-day period for appeal has expired, may proceed to levy on the taxpayer's property until the tax is collected. AS 43.05.270.

When a taxpayer files a request for appeal with DOR, it may request either an "informal conference" or a "formal hearing." AS 43.-05.240(a)(b). If a taxpayer requests an informal conference and the conference does not resolve the dispute to the taxpayer's satisfaction, the taxpayer may request a formal hearing within thirty days after the decision resulting from the informal conference. AS 43.05.240(b)(2). If a taxpayer fails to request a formal hearing within thirty days after the decision of the informal conference, the informal conference decision becomes the final decision of DOR and it may be enforced as such. Informal conference decisions may not be appealed to the courts. AS 43.05.240(d); 15 AAC 05.020(c), .040. Where a formal hearing is requested, either following an informal conference or directly upon filing a request for appeal, the taxpayer is given a formal adjudicatory hearing. 15 AAC 05.030. If the taxpayer is dissatisfied with the result of the formal hearing, the taxpayer may ap-

vide for total appropriations equal to the amount of appropriations made in the previous calendar year for the previous fiscal year.

(c) An appropriation from the budget reserve fund may be made for any public purpose upon affirmative vote of three-fourths of the members of each house of the legislature.

(d) If an appropriation is made from the budget reserve fund, until the amount appropriated is repaid, the amount of money in the general fund available for appropriation at the end of each succeeding fiscal year shall be deposited in the budget reserve fund. The legislature shall implement this subsection by law.

peal to the superior court within thirty days after the decision. AS 43.05.240(d).

At any point in this process DOR and the taxpayer may agree on the taxes owed, or the taxpayer may decide to pay the amount claimed by the State either as a result of the assessment, the informal conference decision, or the decision following a formal hearing. DOR has taken the position that funds received after a request for formal hearing must be deposited in the budget reserve fund while funds received before a request for formal hearing are paid into the State general fund. DOR, in other words, is of the view that an administrative proceeding is not initiated for the purposes of article IX, section 17(a) until a request for formal hearing is made.

During the 1993 legislative session, the legislature appropriated virtually all of the anticipated revenues from the general fund for the fiscal year 1994. Subsequently, a group of legislators who constitute the majority coalition of the Senate (hereafter referred to as the Senate Majority) filed a suit against Governor Walter J. Hickel and Commissioner of Revenue Darrel J. Rexwinkel (hereafter referred to as the State). The suit challenged the deposit into the general fund of funds received after a request for appeal but before a request for formal hearing. Former Governor Steve Cowper filed a similar action. The cases were consolidated. The Senate Majority and Gov. Cowper moved for summary judgment and the State cross-moved for summary judgment.

Following a hearing, the superior court granted the plaintiffs' motions for summary judgment, holding that for the purposes of section 17, administrative proceedings begin once a request for appeal is filed by a taxpayer. The court ordered the State to restore wrongfully allocated funds to the budget reserve fund, with interest, not later than the end of the regular session of the current state legislature.[2] The court noted that preliminary indications were that at least $924,051,580.19 in principal would be required in order to accomplish this. From this order the State has appealed.

The superior court's Final Order and Judgment also ordered the State to provide plaintiffs with an accounting of the receipt and disposition of all monies received after July 1, 1990, as a result of the termination, through settlement or otherwise, of all informal conferences. The accounting is to include the date and amount of money received for each termination. The court also ordered the State to produce its interest computations for settlements received through informal proceedings and "any documents referring to that part of the 1993 settlement of the oil and gas tax dispute with British Petroleum which was allocated to preinformal conference general fund revenues." The court also subjected the accounting and document productions to a protective order, prohibiting the plaintiffs or their attorneys from disclosing the contents of any of the documents.

The State appealed from that portion of the Final Order and Judgment which required the production of the British Petroleum Company (BP) settlement documents.[3] Gov. Cowper cross-appealed, objecting to the confidentiality aspect of the protective order. He also contends that the accounting should include the actual income earned by the State on the settlement funds.

Because of the significant public interest in a speedy resolution of this dispute, we granted the parties' motions for expedited review. Following oral argument on January 26, 1994, we issued an order affirming the first three paragraphs of the Final Order and Judgment of superior court.[4] In addition, we

---

2. It is anticipated that the regular session will end no later than May 10, 1994.

3. At oral argument, the State abandoned this argument as moot, in light of agreement among the parties on the scope of the superior court's production order.

4. These three paragraphs stated:
    1. The term "administrative proceeding," as it is used in Article IX, Section 17 of the Alaska Constitution, includes the informal conference process established pursuant to A.S. 43.05.240 and 15 AAC 05.010 and .020.
    2. All monies received by the State after July 1, 1990, as a result of the termination, through settlement or otherwise, of all informal conference appeals involving mineral lease bonuses, rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments or bonuses, or involving taxes imposed

ordered the parties to brief the question whether an administrative proceeding within the meaning of article IX section 17 begins, in a tax collection context, with the issuance of an assessment. Further, we ordered the parties to brief the question whether, assuming that an administrative proceeding did commence with an assessment, such a ruling should be given prospective effect.[5] We reserved decision on all other issues raised in the appeal and the cross-appeal. In our order we gave summary reasons for our action which we set forth here:

The essential attributes of an "administrative proceeding" as the term is used in article IX, section 17 of the Alaska Constitution are:

1. A dispute must exist.
2. A document reflecting the fact of the dispute which serves a function similar to that of a complaint in a civil action, or an accusation or statement of issues under the Administrative Procedure Act, AS 44.62.360, 370, must be served by one party on the other party.
3. The document must set in motion mechanisms prescribed by statute or regulation under which the dispute will ultimately be resolved.

The proceedings which take place after a "request for appeal" is filed under AS 43.-05.240(a) and 15 AAC 05.020 clearly have these attributes. For this reason, the first three paragraphs of the judgment of December 14, 1993, are affirmed.

At oral argument, the question was raised whether an assessment marks the beginning point of an administrative proceeding. This question was neither raised nor resolved in the superior court and thus would ordinarily be considered waived for the purpose of this litigation. However, this is a question of substance which can be raised in the future. If it is raised successfully, it could cause fiscal problems of an extremely serious nature. Thus, sound reasons require the consideration of an issue not raised by the parties. *See Vest v. First National Bank of Fairbanks*, 659 P.2d 1233, 1234 n. 2 (Alaska) ("Where . . . an issue that has not been raised involves a question of law that is critical to a proper and just decision, we will not hesitate to consider it, particularly after calling the matter to the attention of the parties and affording them the opportunity to brief the issue."), *reh'g granted*, 670 P.2d 707 (Alaska 1983). For this reason we have ordered supplemental briefing.

Supplemental briefs were submitted by the parties and additional oral argument was held. Both Gov. Cowper and the Senate Majority argue that an assessment begins an administrative proceeding and that a ruling to this effect should not be given only prospective effect. Gov. Cowper argues in addition to the questions ordered briefed that an audit letter which identifies the tax returns to be audited and the information and docu-

on mineral income, production, or property, shall be deposited into the Budget Reserve Fund established by Art. IX, Sec. 17 of the Alaska Constitution, along with an amount of money equal to the income which would have been earned on these funds if the funds had been properly placed in the Constitutional Budget Reserve Fund.[1]

[1] The evidence presented by the parties up to the date of this final order suggests that the relevant monies received by the State after July 1, 1990, totals an amount of not less than $951,518.827.86, which total represents at least $924,051,580.19 in principal, plus at least $27,467,247.67 in income which would have been earned.

3. The defendants are hereby ordered to restore and fully fund the constitutional Budget Reserve Fund, by not later than the end of the regular session of the Eighteenth Alaska Legislature, consistent with the terms of this order and with Article IX, Section 17 of

the Alaska Constitution. Action by the State of Alaska consistent with the constitution and laws of the State which properly obligate these funds is not precluded by this order. (e.g., a ¾ths vote of each house of the legislature to authorize appropriation of part or all of the funds).

5. The order stated:

The parties shall submit supplemental briefs, on a schedule to be established by the clerk, on the following questions:
(a) Whether the notice and demand for payment provided in AS 43.05.245—also referred to as the assessment—triggers the beginning of an "administrative proceeding" within the meaning of article IX, section 17 of the Alaska Constitution; and, if so,
(b) Whether any ruling so concluding should be given prospective effect only.

ments to be produced at the audit, rather than a subsequently occurring notice of assessment, is the beginning of an administrative proceeding. In addition, Gov. Cowper argues specifically with respect to a settlement with BP which included some years for which no assessment had been issued as well as some years for which an assessment and a notice of appeal had been issued, that, as to the pre-assessment years, the funds received should be included within the budget reserve fund because the funds were received "as a result of the termination ... of an administrative proceeding," even though the particular years in question were not formally part of the administrative proceeding. The State agrees that these questions should be addressed.

The Senate Majority also seeks the resolution of an additional issue. The Senate Majority notes that in our order of January 27, 1994, we indicated that one of the attributes of an administrative proceeding included setting in motion "mechanisms prescribed by statute or regulation under which the dispute would ultimately be resolved." It points out that with respect to royalty disputes as distinct from tax disputes, the State has indicated that the Department of Natural Resources does not have statutory or regulatory procedures by which such disputes are conducted. The State agrees that further guidance on this issue is warranted. Neither party, however, describes the dispute resolution mechanism pertaining to royalties.

We address first the basis for our conclusion that administrative proceedings possess the attributes we identified in the order of January 27th. Next, we conclude that in view of these attributes an administrative proceeding concerning back taxes begins when an assessment is issued. An audit letter does not mark the beginning of an administrative proceeding. We also conclude that our ruling that an administrative proceeding begins with an assessment should not be given solely prospective effect. With respect to the issues characterized by the BP settlement and the questions concerning the procedures used in resolving royalty dis-

putes, we express no opinion as the record before us is insufficient both in terms of underlying facts and development of legal issues for expression of any view. Finally, we hold that on the record before us, the superior court did not abuse its discretion by subjecting the accounting to a protective order, in light of the confidentiality requirements of AS 43.05.230. On remand, however, the superior court remains free to consider whether a more narrow protective order may adequately protect these concerns.

1. *Attributes of an Administrative Proceeding.*

As noted, we set out the following as attributes of an administrative proceeding in our order of January 27, 1994:

1. A dispute must exist.
2. A document reflecting the fact of the dispute which serves a function similar to that of a complaint in a civil action, or an accusation or statement of issues under the Administrative Procedure Act, AS 44.62.360, 370, must be served by one party on the other party.
3. The document must set in motion mechanisms prescribed by statute or regulation under which the dispute will ultimately be resolved.

Although there is no single authority which concisely defines an administrative proceeding, examination of case law and Alaska statutes involving adjudicatory administrative proceedings demonstrates that these attributes are common to such proceedings.[6] The context in which the term administrative proceeding is used in section 17, the common meaning of the words, and evidence of legislative and voter intent and purpose also support the recognition of these attributes.

We have previously set forth the appropriate approach to interpreting constitutional language. "Constitutional provisions should be given a reasonable and practical interpretation in accordance with common sense. The court should look to the plain meaning and purpose of the provision and the intent of the framers." *Arco Alaska, Inc. v. State,*

---

6. To be distinguished are rulemaking administrative proceedings which are clearly not included within the meaning of the term used in article IX, section 17.

824 P.2d 708, 710 (Alaska 1992) (citation omitted); *see also Kochutin v. State*, 739 P.2d 170, 171 (Alaska 1987). "Adherence to the common understanding of words is especially important in construing provisions of the Alaska Constitution, because the court must 'look to the meaning that the voters would have placed on its provisions.'" *Division of Elections v. Johnstone*, 669 P.2d 537, 539 (Alaska 1983) (quoting *State v. Lewis*, 559 P.2d 630, 637–38 (Alaska), *appeal dismissed*, 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977)), *cert. denied*, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984). "Unless the context suggests otherwise, words are to be given their natural, obvious, and ordinary meaning." *Hammond v. Hoffbeck*, 627 P.2d 1052, 1056 n. 7 (Alaska 1981).

Because of our concern for interpreting the constitution as the people ratified it, we generally are reluctant to construe abstrusely any constitutional term that has a plain ordinary meaning. Rather, absent some signs that the term has acquired a peculiar meaning by statutory definition or judicial construction, we defer to the meaning the people themselves probably placed on the provision. Normally, such deference to the intent of the people requires "[a]dherence to the common understanding of words."

*Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 169 (Alaska 1991) (citations omitted) (quoting *Johnstone*, 669 P.2d at 539).

Our objective, therefore, is to identify the meaning that the people probably placed on the term "administrative proceeding." We begin by recognizing that administrative agencies today perform a wide range of functions and activities, including supplying services, licensing, investigating, rulemaking, and individualized decision-making in the nature of adjudication. In the proper context investigation, rulemaking, and adjudication all could be labelled "administrative proceedings." In the context of section 17, however, it is extremely unlikely that the people would have understood "administrative proceeding" to mean rulemaking or investigation. First, rulemaking and investigation do not normally terminate "by settlement," as does adjudication, nor would they normally result in the receipt of money as a result of their termination.[7] Second, such an understanding of the term would be contrary to the purpose of the amendment, which was to remove certain unexpected[8] income from the appropriations power of the legislature, and to save that income for future need.[9] Money eventually received as a result of rulemaking, in accordance with the rules adopted, can hardly be called unexpected.

Once we recognize that the people probably understood the term "administrative proceeding" to mean adjudication-like proceedings before administrative agencies, as opposed to rulemaking or investigative actions, our task is to identify the essential attributes of this type of proceeding in order to distinguish between administrative actions which are "administrative proceedings" within the

7. In construing the meaning of a statute or constitutional provision, it is necessary to view the words in the context in which they are used. *Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1044 (Alaska 1992).

8. The record is replete with references, in both the legislative history of Senate Resolve No. 129 and the voter pamphlet explaining the proposed constitutional amendment which became section 17, to the need to remove "windfalls" from the normal appropriations power of the legislature. *See* House Finance Fiscal Policy Subcommittee Report No. 3, at 15 (Jan. 10, 1990); House Finance Committee Hearing (May 1, 1990), transcript at 37; Voter pamphlet, statements for and against amendment. "Windfall" is not the most precise of terms. The most relevant definition in

*Webster's Third New Int'l Dictionary* 2619–20 (1969), is "an unexpected or sudden gain or advantage."

9. Article IX, section 17 is a response to a perceived impending fiscal crisis resulting from a growing gap between State spending levels and general fund revenues. *See* House Finance Fiscal Policy Subcommittee Report No. 3 (Jan. 10, 1990). To combat this "gap" and the crisis thought to accompany it, the amendment seeks to hold down current spending levels, by preventing the legislature from appropriating certain "windfall" receipts *and* creating a savings fund to help offset future revenue declines. *Id.; see also* Statement in support of Amendment in voter pamphlet.

meaning of section 17 and related administrative actions which are not.[10]

The first attribute an "administrative proceeding" must possess is that a dispute must exist for the proceeding to resolve.[11] This attribute derives from the language of section 17, the voter pamphlet, legislative use of the term, and our recognition that the people understood "administrative proceeding" to mean adjudicatory proceedings.

Article IX, section 17 clearly indicates that an administrative proceeding is a proceeding which may "terminate, through settlement or otherwise." § 17(a). "Settlement," the only specific means listed in the Constitution by which an administrative proceeding may terminate, implies the existence of opposing parties who reach a compromise. "Settlement" thus assumes a preexisting dispute.

This reading is also supported by the voter pamphlet for the 1990 election.[12] Although most of the references in the voter pamphlet to the sources of revenues which would be deposited in the budget reserve fund use language which closely parallels section 17's language,[13] the statement in support of the amendment refers to windfall revenues "that result from pending litigation and tax disputes." When this statement is compared with the constitutional language allocating to the budget reserve fund money received "as a result of the termination, through settlement or otherwise, of an administrative proceeding or of litigation," it is clear that "tax disputes" refers to administrative proceedings.

The use of the term "administrative proceeding" in the Alaska Statutes also generally supports the existence of a dispute as an essential element in that term's meaning. "Administrative proceeding" is never defined in the Alaska Statutes. In most cases, however, the context in which the term is used demonstrates that an adjudicatory proceeding, usually between an agency of the State and some private individual or entity, is anticipated.[14] As discussed below, such adjudi-

**10.** We undertake this "essential attribute" analysis rather than rely on the labels given certain procedures by the legislature or the agencies themselves because it is a necessary step in interpreting the constitution as the people ratified it. Recognizing that the people understood the term "administrative proceeding" to reach the adjudicatory functions of administrative agencies is only a first step. It is not an end in itself. We must also determine what the people would have understood such adjudications to contain. Labels alone cannot answer this question.

Similarly, our use of the term "adjudicatory" and its derivatives to describe the type of proceedings referred to by "administrative proceeding" in section 17 is not meant to graft "adjudicatory" into the Alaska Constitution. It is merely an useful means of distinguishing the type of administrative actions encompassed by the constitutional language from other types of actions which are not included. We might also refer to this type of administrative action as "dispute resolution procedures." For this reason, we do not consider narrow, context-specific definitions of adjudications, like those described by the Administrative Procedures Act, AS 44.62.330–.630, (APA) to be controlling. Although we look to the APA for help in determining the essential attributes of adjudicatory procedures, the APA also provides procedural protections which serve other functions and are not essential to the concept of adjudication, or individualized decision-making.

**11.** "Dispute" is defined as "a conflict or controversy; a conflict of claims or rights; an assertion

of a right, claim, or demand on one side, met by contrary claims or allegations on the other. The subject of litigation; the matter for which a suit is brought and upon which issue is joined, and in relation to which jurors are called and witnesses examined." *Black's Law Dictionary* 472 (6th ed. 1990).

**12.** This pamphlet is an authoritative source of the voters' common understanding of section 17. *See, e.g., State v. Lewis,* 559 P.2d at 637–38 (relying on widely distributed report explaining constitutional provisions to Alaska voters as the most "cogent expression of the intent ... of those voting for ratification of the Constitution").

**13.** The ballot measure refers to money received from "mineral revenue lawsuits or administrative actions." The neutral description of the amendment prepared by the Legislative Affairs Agency uses the term "administrative proceeding." The statement in support of the amendment also refers to "[r]evenues from mineral or oil and gas legal settlements and administrative proceedings."

**14.** *See, e.g.,* AS 10.13.870 (providing for appeal from "administrative proceedings"; implying that proceeding itself adjudicated rights); AS 14.480.190 (providing for imposition of civil fine in "administrative proceeding"); AS 25.35.120 (referring to parties to an administrative proceeding); AS 34.08.320 (granting association of owners in common interest community the power to "institute, defend, or intervene in litigation or administrative proceedings"). We decline to

cations are predicated on the existence of an underlying dispute.

Finally, we consider the existence of a dispute to be an essential attribute of· an administrative proceeding because it is a common element in all adjudicatory proceedings. For example, *Black's Law Dictionary* defines "adjudication" as "[t]he legal process of resolving a dispute" and "adjudicatory process" as a "[m]ethod of adjudicating factual disputes; used generally in reference to administrative proceedings in contrast to judicial proceedings." *Id.* at 42. Similarly, the formal rules governing administrative adjudications under the Administrative Procedures Act (APA), AS 44.62.330–.630, clearly anticipate the existence of a dispute before action is taken. For example, an accusation under AS 44.62.360 must set out "the acts or omissions with which the respondent is charged, so that the respondent is able to prepare a defense." AS 44.62.360(1). Both the use of the word "charged" and the recognition of the need for a defense indicate the necessary existence of an underlying controversy or dispute. A statement of issues, as provided for in AS 44.62.370, anticipates that the respondent "must show compliance [with a statute or regulation] by producing proof at the hearing," and must specify "particular matters that have come to the attention of the initiating party and that would authorize

a denial of the agency action sought." AS 44.62.370(a)(1)(2). The necessity of one party carrying a burden of production and the possibility that a request for a right or privilege may be denied also indicate the existence of an underlying dispute.[15]

Because a dispute exists in all adjudicatory proceedings, and because the language of section 17 and the voter pamphlet indicate that "administrative proceeding" meant a proceeding involving a dispute, the first essential attribute of an administrative proceeding is that a dispute must exist.

■ The second essential attribute of an administrative proceeding is that a document reflecting the fact of the dispute, which serves a function similar to that of a complaint in a civil action, or an accusation or statement of issues under the APA, must be served by one party on the other party.[16] This element is required in order to ensure that the procedures we recognize as administrative proceedings meet minimal due process requirements.[17] Although we are not directly concerned in this litigation with the due process rights of the participants in administrative proceedings, minimal due process requirements do define necessary requirements of all adjudicatory proceedings. Without providing at least notice and the

undertake an extensive analysis of each of the several statutory references to "administrative proceedings" because the use of the term in the statutes is never so specific as to impose a peculiar meaning.

15. We emphasis that a dispute may exist for our purposes even where the non-initiating party immediately agrees with the initiating party's assertions and where the non-initiating party would have been disposed to agree prior to initiation of the proceeding. It is the placing of an issue in controversy, under circumstances that require a response and eventual resolution of the issue, and not the exact means by which a resolution is reached, that indicate the presence of a dispute.

16. The primary function of each of these documents is to provide specific written notice to the other party that rights or obligations between the parties are being contested and that particular relief is being sought. For example, under the APA both an accusation and a statement of issues must be in writing, specify the statute or regulation at issue, include reference to any particular conduct which would justify denial of the right at

issue, and be served on the opposing party. AS 44.62.360, .370. Similarly, a civil complaint must contain a statement of the claim showing entitlement to relief and a demand for judgment, and be served on the opposing party. Alaska Rules of Civil Procedure 4, 8. We note that each of these documents also serves to set in motion mechanisms for the resolution of the dispute. We address this function as the third essential attribute of an administrative proceeding.

17. *See Wickersham v. State, Commercial Fisheries Entry Comm'n*, 680 P.2d 1135, 1144 (Alaska 1984) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action.") (quoting *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)); *see also Kerr v. Kerr*, 779 P.2d 341, 342 (Alaska 1989) ("Notice reasonably calculated to afford the parties an opportunity to present objections to a proceeding, and affording them a reasonable time to do so, is a fundamental requirement of due process.").

opportunity to participate to those who might be affected, no administrative action can either resolve the dispute to the satisfaction of all of the parties or be considered final despite later objections. *See Wickersham,* 680 P.2d at 1144; *Kerr,* 779 P.2d at 342. Because we conclude that an "administrative proceeding" must be an action capable of finally resolving the issue in dispute, either by the express consent of all of the parties or by reaching a determination which could be accorded finality consistent with due process, we hold that sufficient written notice, specifying the nature of the dispute and the relief requested, is essential to an administrative proceeding.[18]

■ Our conclusion that an administrative proceeding must be an action which is capable of being accorded finality consistent with the requirements of due process is supported by the language of section 17. The phrase "as a result of the termination, through settlement or otherwise, of an administrative proceeding" clearly implies that an administrative proceeding may terminate with or without the express consent of all of the parties. A party must be aware of the dispute and the existence of the proceedings in order to terminate them by settlement. More importantly, in order for an administrative action to terminate without the consent of all the parties in a manner which may result in the collection of money by the State, individuals affected must have notice and an opportunity to object. Otherwise, no finality

will be accorded the administrative agency's decision in any subsequent action.[19]

The third essential attribute of an administrative proceeding—that the document which one party serves on the other must set in motion mechanisms prescribed by statute or regulation under which the dispute will ultimately be resolved—derives from the ordinary meaning of the word proceeding and the nature of adjudication.

*Webster's Third New International Dictionary* 1807 (1969) defines "proceeding" as "a particular step or series of steps adopted for doing or accomplishing something."[20] Our reference to "mechanisms ... under which the dispute will ultimately be resolved" closely parallels the dictionary definition and follows from it.[21]

The two requirements which our "essential attribute" adds to this dictionary definition— that the document served on the other party set these mechanisms in motion and that the mechanisms be prescribed by statute or regulation—follow from the nature of adjudication and from our recognition that a administrative proceeding under section 17 must be capable of being accorded finality.

Adjudicatory proceedings begin with the issuance by one party to the other of a document which serves both as the initiation of the dispute resolution process and as no-

18. Our conclusion that minimal due process must be afforded in order for an administrative action to be an administrative proceeding under section 17 does not require either a formal hearing or a right of immediate judicial appeal. Both of these additional conditions relate to whether and to what extent the administrative decision will be subject to judicial review, assuming that the private party is not satisfied with the decision. Our concern, however, is not with the means by which further objections may be pursued, but rather with whether, if no objection is made, the decision will be treated as final.

19. *See, e.g., Black's Law Dictionary,* at 42 ("Adjudicatory hearing" is a "proceeding before an administrative agency in which the rights and duties of particular persons are adjudicated after notice and opportunity to be heard.").

20. In another context, we have stated: " 'Proceedings' has been generally described as 'all the steps or measures adopted in the prosecution or

defense of an action.' ... the phrase 'other action or further action or proceeding' as used in AS 34.20.100 means a form of litigation or some type of in-court proceeding." *Hull v. Alaska Fed. Sav. & Loan Ass'n,* 658 P.2d 122, 125 (Alaska 1983) (quoting *Statter v. United States,* 66 F.2d 819, 822 (9th Cir.1933)). This definition was dependent on the context in which the word was used in the statute and therefore is not directly relevant here, especially given that an *administrative* proceeding will never be an in-court proceeding. Nevertheless, this definition does illustrate the use of the word "proceeding" to signify the series of steps involved in reaching a result.

21. *See also Black's Law Dictionary* at 42 ("Adjudicatory action: Administrative actions are 'adjudicatory' in character when they culminate in a final determination affecting personal or property rights.").

tice that the process has been initiated.[22] For example, the APA expressly states that filing an accusation or a statement of issues initiates a hearing. AS 44.62.360, .370. Similarly, the civil rules provide that a civil action is commenced by filing a complaint with the court, and that a copy of the complaint must be served on the opposing party. Alaska Rules of Civil Procedure 3, 4. Therefore, it may be said that these documents have legal significance beyond merely providing notice. They also start in motion the coercive force of the law with the ultimate objective of resolving the dispute. By providing notice, they ensure that the use of this force is fair.

Our recognition that an administrative proceeding necessarily possesses the characteristic of finality requires that the proceeding which is initiated have legal authority to bind the non-initiating party, subject perhaps to further appeal, even if that party disagrees with the solution reached or fails to participate in the resolution. This is a substantive corollary to our earlier recognition that minimum due process is required before binding a party over his objection. Simply put, legal authority to bind a party over his objection, or without his participation in the proceeding, cannot be assumed. Therefore, we require that the mechanisms which attempt to do so be prescribed by law.[23]

This final attribute, more than either of the other two attributes, highlights the difference between the commencement of an administrative proceeding and similar action by a party which does not initiate a proceeding. Unless the document which the first party serves on the opposing party creates a legal obligation on the opposing party to either respond or accept a determination made in the party's absence, then the opposing party is free to ignore the document. If the opposing party is free to ignore the document without consequence, then the document is not part of a proceeding which is capable of finally terminating the dispute without the consent of the opposing party. In other words, so long as the opposing party is free to refuse to participate or to withdraw from any attempt to resolve the dispute without legal consequences, then the attempt may be a settlement negotiation, but it is not an adjudication. By contrast, where the law provides that even an opposing party's complete failure to respond has legal significance and may justify a decision against him or her, then the initial document initiates an adjudication and, provided the other attributes are also present, an administrative proceeding under section 17.

### 2. In a tax collection context, an assessment marks the beginning of an administrative proceeding.

■ An assessment issued by DOR to a taxpayer under AS 43.05.270 satisfies all of the essential elements of an administrative proceeding.

First, at the time that the State issues an assessment, a dispute does exist. As noted above, a dispute may be defined as "a conflict or controversy; a conflict of claims or rights; an assertion of a right, claim, or demand on one side, met by contrary claims or allegations on the other." *Black's Law Dictionary*, at 472. Prior to the time that an assessment is issued, the taxpayer has either filed or failed to file a return. If the taxpayer has filed a return, this may be considered an assertion by the taxpayer that the amount stated, and only the amount stated, is due. Similarly, if a taxpayer fails to file a return, this may be taken as an implied assertion

---

**22.** The same document need not serve both functions. An adjudication does not begin, however, until both functions have been served. Notice without the initiation of the proceeding is only notice of intent to initiate, requiring further notice. Similarly, until the second party is notified of the initiation of the proceeding, the proceeding cannot be effective as an adjudication. Furthermore, the notice document could not vary from the initiating document without a risk of misinforming the receiving party of the nature of the proceedings. As a practical matter the same document will serve both functions.

**23.** We do not address the question whether, in a contractual setting involving rentals or royalties, dispute resolution mechanisms prescribed by contract may substitute for such mechanisms prescribed by statute or regulation within the terms of this definition.

that no taxes are due.[24] If DOR then issues an assessment to the taxpayer, demanding additional tax payments (with interest and penalties), then there has been "an assertion of a right, claim or demand on one side, met by contrary claims or allegations on the other" and a dispute exists.[25]

Second, the assessment reflects the fact of the dispute, serves a function similar to a civil complaint or an accusation or statement of issues under the APA, and is served on the taxpayer. The assessment's reflection of the fact of the dispute is self-evident. An assessment is also served on the taxpayer. *See* AS 43.05.245 ("The notice and demand for payment is issued when the notice and demand is delivered to the taxpayer in person or placed in the United States mail, addressed to the last known address of the taxpayer."). The only significant question with respect to this attribute is whether an assessment serves a function similar to a civil complaint or an accusation or statement of issues.

As discussed above, the primary function of each of these documents is to provide written notice to the other party that a matter is being contested and that particular relief is sought. Examination of the assessment notices provided by the State reveal that assessments also serve this function. The assessment letter itself lists a total amount due and demands payment. This constitutes a claim for relief. In addition, computations explaining the amount due are enclosed with the assessment. These constitute specific notice of the matter being contested and the basis for relief. Therefore, the second attribute of an administrative proceeding is present in a notice of assessment.

Third, the notice of an assessment sets in motion mechanisms prescribed by statute or regulation under which the dispute will ultimately be resolved. Contrary to the State's arguments, this element does not require that a hearing be convened by the document, so long as the law provides that the document will lead toward a resolution of the dispute regardless of the opposing party's response. It is the legal authority to bind the opposing party, and not the exact means by which that authority is exercised, that is essential.

Therefore, an administrative proceeding can begin before any hearing is initiated, if the law constrains the options of the opposing party on receipt of notice of the proceeding and provides mechanisms for resolving the dispute irrespective of the opposing party's response. An assessment has this effect. On receipt of an assessment, the taxpayer may 1) pay the assessment; 2) appeal the assessment; or 3) do nothing. If the taxpayer pays, the dispute is resolved. This is similar to a defendant admitting liability in a civil suit. If the taxpayer appeals, the mechanisms provided for by AS 43.05.240 are set in motion to attempt to resolve the dispute. Finally, if the taxpayer does nothing, AS 43.05.270 provides that the State may levy against the taxpayer. Once the sixty-day period for appealing the assessment has expired, however, the taxpayer may no longer challenge the substantive basis of the assessment.[26] The statutory scheme by which an assessment is converted into a debt to the State if no appeal is filed is itself a mechanism for resolving the dispute.

24. The taxation statutes of Alaska *require* a taxpayer to file a return if taxes are due. *See, e.g.,* AS 43.20.030(a), 43.55.020–.030. There is no provision which allows a taxpayer to request without penalty that DOR complete its return. If the taxpayer fails to file a return, DOR is authorized to complete a return on the taxpayer's behalf. AS 43.05.245. The taxpayer will, however, be responsible for all penalties associated with failing to file a timely return. Therefore, if an individual or entity fails to file a return, an implied assertion that no taxes are due is made.

25. This is true even if the taxpayer immediately concedes the correctness of the assessment and the error of its own return. At the moment that the assessment is issued, the State and the taxpayer have contrary assertions outstanding concerning the amount of tax owed. Subsequent agreement cannot erase this moment of disagreement. An administrative proceeding requires no greater dispute.

26. In effect a taxpayer's failure to respond to an assessment is similar to a failure to appeal a judgment or a failure to participate in a civil action or an adjudication under the APA. In all of these cases, the party's failure to act has legal consequences. *See* Appellate Rule 204; Civil Rule 55; AS 44.62.530.

As an assessment possesses each of the essential attributes which we have identified, it marks the beginning of an administrative proceeding in the tax collection process for purposes of Article IX, section 17 of the Alaska Constitution.[27]

### 3. An audit letter does not mark the commencement of an administrative proceeding.

■ An audit letter does not satisfy the essential elements of an administrative proceeding. Mere notice of an intention to investigate neither indicates the existence of a dispute nor sets in motion mechanisms for the resolution of a dispute.

No dispute exists when the audit letter is sent. On the contrary, the need for an audit indicates that more information is required before the State can agree or disagree with the taxpayer's return. For this reason, an audit is more properly described as an investigation than an administrative proceeding. *See Mallas v. United States*, 993 F.2d 1111, 1122–24 (4th Cir.1993) (holding that an I.R.S. audit is an investigation and not an "administrative proceeding").

In addition, an audit letter does not set in motion any mechanisms for resolving a dispute, even if a dispute did exist at the time. As an investigative procedure, an audit helps the State to determine what its position is. Nothing in the audit procedure itself can be characterized as an attempt to resolve a dispute.[28]

### 4. Whether our ruling that an administrative proceeding is triggered by an assessment should be given only prospective effect.

■ This court set forth the conditions necessary for nonretroactive treatment in *Plumley v. Hale*, 594 P.2d 497, 503 (Alaska 1979):

1) the holding is one of first impression, or overrules prior law, and was not foreshadowed in earlier decisions; 2) there has been justifiable reliance on an alternative interpretation of the law; 3) undue hardship would result from retroactive application;[29] and 4) the purpose and intended effect of the holding is best accomplished by prospective application.

We apply these factors both to our initial decision that an informal conference is an administrative proceeding and to our decision today that the notice of assessment marks the beginning of an administrative proceeding in the tax collection process. Although the question of retroactive application arose separately in the course of the proceedings in this case with respect to these two decisions, the analysis is essentially the same.

The first factor is a threshold requirement. *Commercial Fisheries Entry Comm'n v. Byayuk*, 684 P.2d 114, 117 (Alaska 1984). It is satisfied. In *Johnstone*, 669 P.2d at 544, this court held that this requirement was met where "[n]o prior Alaska case has attempted to construe the meaning of the word" and prior nonjudicial opinions "indicated the

---

**27.** Because the assessment marks the beginning of an administrative proceeding and because mechanisms which follow from the assessment are part of the proceeding, it is unnecessary to separately discuss application of our essential attribute analysis to the informal conference process.

**28.** We note that at the time the House Finance Committee amended the legislative resolve that was to become section 17 to include the term "administrative proceeding," the amendment was described as reaching "back taxes that are still under consideration in the Department of Revenue." House Financing Committee Hearing (May 1, 1990), transcript at 38 (comments of budget officer Mary Halloran). We recognize that "back taxes" could conceivably include all taxes received after an original due date, including all amounts received during the course of an

audit. This phrase, however, does not control over the language of the constitution itself, which explicitly requires that money for the budget reserve be received as a result of an administrative proceeding.

**29.** In *Commercial Fisheries Entry Comm'n v. Byayuk*, 684 P.2d 114, 117 (Alaska 1984), the court restated this element as requiring consideration of the effect retroactive application would have on the administration of justice. However this element is stated, it requires an analysis of whether retroactive application will cause more harm than good. *See Johnstone*, 669 P.2d at 545 (stating this element as "whether a holding of retroactivity would cause substantial inequitable results, injustice or harm") (quoting *Warwick v. State ex rel. Chance*, 548 P.2d 384, 395 (Alaska 1976)).

presence of real uncertainty." This court has also stated that "if the question answered by the new rule was 'subject to rational disagreement' the threshold showing is met and the court will weigh the remaining criteria." *Truesdell v. Halliburton Co.*, 754 P.2d 236, 239 (Alaska 1988) (quoting *Vienna v. Scott Wetzel Services, Inc.*, 740 P.2d 447, 450 (Alaska 1987)). Although we reject the State's interpretation of "administrative proceeding," we cannot say that it was irrational. Moreover, at the time the State adopted its position, no Alaska case indicated the proper result. We therefore consider the remaining factors.

The second factor—justifiable reliance on an alternative explanation—supports nonretroactive application, but carries relatively little weight. The State has demonstrated that the intended recipients of fiscal year 1994 appropriations have relied on the appropriations. While retroactive application might cause reevaluation of these appropriations, it will not, however, require any specific appropriation to be rescinded. In addition, this reliance is two steps removed from the issue in this case—the proper allocation of money to the budget reserve fund. The primary focus of concern in weighing this factor is whether the legislative and executive branches justifiably relied on the availability of the monies at issue in this case when making fiscal year 1994 appropriations.

These monies were deposited in the general fund in reliance on a April 24, 1992, Attorney General's Opinion. Even assuming that the State's reliance on the Attorney General's Opinion is an appropriate basis for considering nonretroactive application,[30] at the time that the legislature appropriated the informal conference collection receipts from the general fund, the Attorney General's Opinion had been subject to significant criticism, and the possibility that the money should have been deposited into the budget reserve fund was well recognized.[31] Because the risk of a subsequent judicial decision requiring deposit of these funds in the budget reserve was apparent at the time of the appropriations, we give significantly less weight to this factor.[32]

The third factor—whether retroactive application will result in undue hardship or have a negative effect on the administration of justice—is essentially neutral. Some hardship may be inherent in ordering the State to restore close to one billion dollars, plus interest, to the budget reserve fund after the money has already been allocated. Repayment of this amount could, to a certain extent, require reconsideration of 1994 appropriations. Such reconsideration could, in turn, cause uncertainty and, in some cases, hardship, for those who have relied on the appropriations passed.

Alternatively, however, repayment could be made without hardship from other sources including, most notably, earnings and accumulated earnings from the Alaska Permanent Fund.[33] Moreover, the provisions of section 17 provide the opportunity for significant alleviation or elimination of hardships. First, if and to the extent that removing this amount from the general fund reduces the amount available for appropriation in fiscal year 1994 below the amount appropriated for fiscal year 1993, a simple majority of each house can approve appropriations from the budget reserve fund. Alaska Const. art. IX, § 17(b). Second, to the extent the legislature wishes to continue appropriations for fiscal year 1994 in excess of fiscal year 1993, the legislature can reach the budget reserve fund by an "affirmative vote of three-fourths of the members of each house." Alaska

---

30. We have previously noted that this factor "is generally designed to protect persons who innocently rely on judicial or legislative law rather than agencies which rely on their own regulation." *Byayuk,* 684 P.2d at 119.

31. Members of the legislature had insisted that informal conference settlement proceeds be separately tracked within the general fund. This accounting system was in use at the time these funds were appropriated.

32. This factor carries more weight with respect to monies received after a notice of assessment had been issued but prior to a taxpayer appeal. The possibility that the constitutional language reached such monies was not fully comprehended until well into the current litigation.

33. The Alaska Permanent Fund was established under article IX, section 15 of the Alaska Constitution.

Const. art. IX, § 17(c). The superior court's decision to effectively stay its order to restore the budget reserve fund until the close of the legislative session, which we affirmed in our January 27 order, allows the State the opportunity to employ these procedures in order to alleviate or avoid hardships.

The final factor to be weighed is whether the purpose and intended effect of the holding is best served by prospective application only. This is "the single most important criterion to use in determining whether to apply a new rule of law retroactively or prospectively." *Byayuk*, 684 P.2d at 118. This factor weighs heavily against nonretroactive application. Where the issue before the court is one of constitutional interpretation, the purpose of the court's holding is to give effect to the purpose of the provision and the intent of the framers. *See, e.g., Citizens Coalition*, 810 P.2d at 168 ("[W]e must never lose sight of another important right of the people implicated in all cases of constitutional construction, namely the right to have the constitution upheld as the people ratified it."); *see also Johnstone*, 669 P.2d at 544 (looking to purpose of constitutional provision in considering this factor).

The purpose of the budget reserve amendment, as well as two of its explicit provisions, would be frustrated or violated by nonretroactive application. The constitutional amendment arose out of concern about a growing gap between spending and revenues. To combat this gap, the reserve fund was proposed to save money against future economic downturns *and* to remove from the current appropriations power certain revenues. Nonretroactive application would frustrate this second purpose by allowing the legislature to appropriate from these revenues close to one billion dollars more than the voters of Alaska intended them to have access to, without meeting the requirements for appropriating out of the budget reserve which are specified in the constitution.

In addition, prospective application would violate the explicit retroactive provision and frustrate the repayment provision of section 17. Section 17 provides that "all money received by the State after July 1, 1990 [from the designated revenues] shall be deposited in the budget reserve fund." Alaska Const. art. IX, § 17(a). The amendment was not voted on until November 1990 and did not become effective until January 1991. At the time it was presented to the voters, therefore, it contained a retroactive provision. By approving the amendment, the voters approved this retroactive provision. Nonretroactive application would ignore the language of the amendment and the intent of the voters.

In addition, nonretroactive application would mean that money which was within the scope of the budget reserve fund, and which should have been deposited into that account, would be subject to allocation without following the procedures required in section 17(b) and (c). Nonretroactive application would also avoid the effect of section 17(d), which requires that all money appropriated from the budget reserve fund must be repaid out of money remaining in the general fund at the end of a fiscal year. Alaska Const. art. IX, § 17(d).

On consideration of all of these factors, we conclude that nonretroactive application of our decision construing the term "administrative proceeding" and holding that the notice of assessment marks the beginning of an administrative proceeding in the tax collection process would be highly inappropriate. The potential hardships of retroactive application and the State's reliance on a more narrow interpretation than we adopt do not outweigh the importance of giving effect to the constitution as adopted by the people.

5. *The superior court did not abuse its discretion by subjecting the accounting of informal conference settlement receipts to a protective order.*

■ Alaska Statute 43.05.230 provides that "[i]t is unlawful for a current or former officer, employee, or agent of the state to divulge the amount of income or particulars set out or disclosed in a report or return made under [Title 43]" except under limited circumstances. AS 43.05.230(a). At the time of the superior court's final order, the parties disputed whether the information which would be contained in the accounting, particularly the dates and amounts of individual settlements, would effectively reveal both the identity of individual taxpayers and "particu-

lars" of their returns. Rather than resolve this dispute on the scant information before it and risk accidentally revealing confidential information, or delay entry of final judgment until the issue could be more fully litigated and thus thwart the strong public interest in a speedy resolution of the underlying dispute over a collateral matter, the superior court granted the protective order and explicitly stated that it was subject to further order of the court. On the record before us, we are unwilling to say that the superior court abused its discretion. On remand, however, the superior court is free to revise this protective order in the light of a more fully developed record.[34]

For the reasons set forth in this opinion, we hold that an administrative proceeding begins, for tax purposes, with the issuance of an assessment to the taxpayer. We express no opinion on the issues characterized by the BP settlement, or on the questions concerning the procedures used in resolving royalty disputes. We remand to the superior court for further proceedings in accordance with this opinion.

---

34. We also reject Gov. Cowper's argument that the accounting ordered by the superior court should include the income actually earned on funds which should have been deposited in the budget reserve but were not. Article IX, section 17 establishes the correct measure of income owed to the fund on monies incorrectly withheld from the fund: "Money in the budget reserve fund shall be invested so as to yield competitive market rates to the fund." § 17(a). The State proposed calculating the interest due on the amount in controversy based on the actual return received by the fund for the relative time periods. The superior court ordered the State to provide Gov. Cowper and the Senate Majority with these computations. Unless the plaintiffs can show reason why this is not an accurate means of calculating the interest owed, no further information is necessary. Our ruling on this point should not be read as suggesting that the income actually earned is not public information available to any member of the public even in the absence of litigation. Such information is, however, not relevant to the remedy in this case.