Lisa HAGGBLOM, Appellant,

v.

CITY OF DILLINGHAM, Appellee.

No. S–12358.

Supreme Court of Alaska.

Aug. 29, 2008.

---

Susan Mitchell, Bristol Bay Law Center, LLC, Dillingham, for Appellant.

Krista S. Stearns, Boyd, Chandler & Falconer, LLP, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A Dillingham ordinance provides that any animal that bites a person without provocation shall be deemed vicious and, after quarantine, shall be euthanized. A Dillingham dog owner whose dog bit a co-worker without provocation appeals the city's order, affirmed by the superior court, for euthanasia or ban-

ishment of the animal. Finding no constitutional or procedural infirmity, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

On April 12, 2006, Lisa Haggblom took her dog Muneca with her to work. She confined Muneca in her office behind a child gate. While Haggblom was working at her desk, her co-worker Sharron Simpson approached Haggblom's office and reached down to open the child's gate. Muneca bit Simpson on the hand. Neither Haggblom nor Simpson heard Muneca growl or give any other warning that she was about to bite. Haggblom testified that she did not see the bite occur, and Simpson testified that she did not see Muneca until the dog bit her.

Haggblom reported the bite to the Dillingham Police Department, and Community Service Officer (CSO) Gary Peters investigated the incident. Peters spoke with Simpson and observed two shallow puncture wounds with bruising on her hand. He also claims to have spoken with Haggblom, and that she volunteered information regarding her practices for controlling Muneca when the dog was with her in the office. Haggblom testified that she only signed papers and did not tell CSO Peters her version of the story. On the basis of his investigation, Peters deemed Muneca "vicious" under the dog bite ordinance. Two days later the city sent Haggblom official notice of the viciousness determination and, as required by the ordinance, the date set for euthanasia. The letter, signed by Chief of Police Richard J. Thompson, informed Haggblom that she could appeal the determination under Dillingham Municipal Code (DMC) 07.07.030(D)(3).

### B. Proceedings

Haggblom administratively appealed the decision, and Chief Thompson was appointed hearing officer.[1] Haggblom testified at the hearing. This was the only evidence presented at the hearing, though Chief Thompson had reviewed the bite report prior to the hearing. Haggblom did not ask whether she

---

1. DMC 07.07.030(D) provides for the City Man- ager or his designee to hear euthanasia appeals.

could introduce other witnesses or be represented by counsel. Chief Thompson upheld the viciousness determination and informed Haggblom that Muneca must either be euthanized or banished from Dillingham city limits. He also told her she had a right to appeal his decision.

Haggblom filed a complaint in superior court seeking a temporary restraining order and permanent injunctive relief. The court granted the temporary restraining order and held a preliminary injunction hearing on May 5. At the hearing, Haggblom was represented by counsel. She testified on her own behalf and also presented a dog behavior expert. Simpson, CSO Peters, and Chief Thompson also testified. On May 11 the superior court denied Haggblom's request for a preliminary injunction. In a written opinion the court stated that it was consolidating the preliminary injunction hearing with trial on the merits pursuant to Alaska Civil Rule 65(a)(2). It therefore "denie[d] this preliminary injunction as a *de novo* case filed to determine the constitutionality of the ordinance." The court held that the ordinance was not vague and that the administrative appeal satisfied due process requirements. The court also noted that "to the extent this decision may be considered an administrative appeal, the court finds substantial evidence to support the municipality's decision." The city moved for final judgment, and Haggblom opposed the motion and requested continued discovery and a trial on the merits. The court entered final judgment for the city.

Haggblom appeals.

## III. STANDARD OF REVIEW

 This court reviews the denial of a preliminary injunction for abuse of discre-

tion.[2] The decision to consolidate a preliminary injunction hearing with a trial on the merits per Civil Rule 65(a)(2) is also reviewed for abuse of discretion.[3] The superior court's interpretation of an ordinance is a question of law reviewed *de novo*.[4] We also review constitutional rulings *de novo*.[5]

## IV. DISCUSSION

### A. Dillingham Municipal Code 07.07.030 Did Not Violate Haggblom's Rights to Due Process.

Haggblom argues that DMC 07.07.030 violates the due process provisions of both the Federal and Alaska Constitutions because: (1) the ordinance does not provide meaningful process; and (2) the ordinance is unconstitutionally vague. We address these two arguments in turn.

### 1. Dillingham Municipal Code 07.07.030 provides adequate notice and an opportunity to be heard.

 At a minimum, due process requires that the parties receive notice and an opportunity to be heard.[6] But "due process does not require a full-scale hearing in every situation to which due process applies."[7] Under both the Federal and Alaska Constitutions, due process analysis involves consideration of three factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail.[8]

---

**2.** *Smallwood v. Cent. Peninsula Gen. Hosp.*, 151 P.3d 319, 322 (Alaska 2006).

**3.** *See D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 158 (2d Cir.2002).

**4.** *See State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 65 (Alaska 2001).

**5.** *Id.*

**6.** *Laidlaw Transit, Inc. v. Anchorage Sch. Dist.*, 118 P.3d 1018, 1026 (Alaska 2005) (quoting

*Hickel v. Halford*, 872 P.2d 171, 179–80 (Alaska 1994)).

**7.** *Id.* (quoting *Frontier Saloon, Inc. v. Alcoholic Beverage Control Bd.*, 524 P.2d 657, 661 (Alaska 1974)).

**8.** *Id.* (noting that this balancing test was adopted from federal due process test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

■ The Dillingham ordinance lists the standards for determining whether an animal is vicious,[9] and requires that any animal deemed vicious be euthanized.[10] The ordinance also provides that the owner of a dog deemed "vicious" must receive notice: (1) of the planned time of euthanasia of the animal, (2) that the animal will be quarantined upon issuance of the notice, and (3) that the owner may appeal the CSO's viciousness determination before the city manager or his designee.[11] It further provides that the appeal shall be limited to whether: (1) "the animal bit a person or domestic animal"; (2) "the animal caused damage to property"; (3) "the bite or damage was without provocation"; and (4) "the animal[,] by its actions, gave indication that it is able to bite any person or animal without provocation." [12]

Haggblom received notice of the viciousness determination, the date of euthanasia, and her right to appeal. She was not told that she had a right to counsel or to bring witnesses, nor did she inquire into these options. Upon completion of the administrative appeal, Chief Thompson informed Haggblom that she had a right to challenge the viciousness determination in superior court.

■ The first element considered under the *Mathews v. Eldridge* test is the importance of the private interest affected by the government action.[13] Here, Haggblom's interest in the continuing health and companionship of her pet is an important one.

While pets are considered property under the law of Alaska,[14] we agree with the parties that the emotional bond people feel towards their pets elevates this interest above most property.

The second element to be considered in the due process analysis is the risk of erroneous deprivation of the private interest and the probable value of additional procedures.[15] Haggblom argues that there is a high risk of erroneous deprivation when parties are not informed of their rights to bring witnesses and have counsel. But her argument is unpersuasive because her case was considered *de novo* at the superior court level.[16] All of the additional procedural safeguards Haggblom requests at the administrative level, including an impartial decision maker, were available to her in the *de novo* trial in superior court.

The third and final element of the due process analysis is the cost to the city of implementing additional procedural safeguards.[17] Haggblom is correct that the potential costs to the city of notifying parties that they have a right to bring witnesses and employ counsel are minimal. But Haggblom remained free at all times to consult or employ counsel and to call witnesses. She was also free to inquire into these areas. We decline to impose a *Miranda*-style duty on the municipality to advise litigants of procedural rights in city administrative hearings. Moreover, given the opportunity for *de novo*

9. DMC 07.07.030(A) provides in relevant part:
 Any animal who bites a person ... without provocation ... shall be deemed vicious.

10. We note that, according to the Alaska Department of Health and Social Services, Division of Public Health, "the incidence of dog bite injury deaths in Alaska was much higher than that of the nation at 123 versus 7.1 per 100 million population per year, respectively." ALASKA DEP'T OF HEALTH & SOC. SERVS., STATE OF ALASKA EPIDEMIOLOGY BULL. NO. 35, DEATHS AND HOSPITALIZATIONS FROM DOG BITE INJURIES—ALASKA, 1991–2002 (2007). The department also reported that "Alaska hospitalization rates ... were higher than in other studies...." *Id.* From 1991–2002, nine deaths and 288 hospitalizations were reported from dog bites in Alaska. *Id.* For the same period, the Associated Press reported that Alaska led the nation in dog bite injury deaths and hospitalizations. *Alaska Leads in Dog Bites*, ANCHORAGE DAILY NEWS, Jan. 21, 2008, at A9.

11. DMC 07.07.030(D) (2003).

12. DMC 07.07.030(E) (2003).

13. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

14. *Richardson v. Fairbanks N. Star Borough*, 705 P.2d 454, 456 (Alaska 1985) (noting that legally dogs are considered personal property).

15. *Laidlaw Transit, Inc. v. Anchorage Sch. Dist.*, 118 P.3d 1018, 1026 (Alaska 2005).

16. Haggblom's due process argument considers only the administrative hearing offered under DMC 07.07.030, and does not address any alleged procedural errors from the superior court hearing.

17. *Laidlaw*, 118 P.3d at 1026.

review at the superior court level, the failure by the city to advise Haggblom of her procedural rights at the administrative level does not violate her right to due process.

Balancing these factors, we conclude that the ordinance provided Haggblom meaningful process, and that the administrative hearing did not violate her due process rights. Haggblom received notice and an opportunity to be heard, and she received a *de novo* trial in superior court.

### 2. Dillingham Municipal Code 07.07.030 is not unconstitutionally vague.

 Haggblom challenges the constitutionality of the Dillingham ordinance, claiming that the ordinance's use of the term "provocation" renders the ordinance unconstitutionally vague. A duly enacted municipal ordinance is presumed to be constitutional, and we will construe an ordinance to avoid, to the extent possible, a finding of unconstitutionality.[18]

 A statute or ordinance is unconstitutionally vague when: (1) it does not give adequate notice of the prohibited conduct, or (2) its language is so imprecise as to encourage arbitrary enforcement.[19] But even an ordinance that fails to give adequate notice of every type of prohibited conduct "may still be sustained (1) if the offense charged falls squarely within its prohibitions and (2) if a construction may be placed upon the [ordinance] so that its reach may be reasonably understood in the future."[20]

We first look to whether the ordinance gives adequate notice of the prohibited conduct. DMC 07.07.030(A) provides that "[a]ny animal who bites a person or animal without provocation, or which, by its actions, gives indication that it is able to bite any person or animal without provocation, shall be deemed vicious." DMC 07.07.030(D) provides that "[v]icious animals shall be euthanized, as established in Section 7.11.010, by the community service officer or agent not less than forty-eight hours after providing actual written notice to the owner or keeper of the dog."

Haggblom argues that the term "provocation," without definition, is so vague as to not give adequate notice of what conduct is prohibited. She points to city council transcripts, not presented below, that purportedly show council members discussing "gray areas" in the animal ordinance and the need for definitions of terms such as "provocation." She also discusses the difference between provocation from a human perspective and provocation from a dog's perspective.

Haggblom's arguments are unpersuasive. Whatever the outside bounds of "without provocation" might be, this case falls squarely within the phrase's plain meaning.[21] Both Haggblom and the bite victim agreed that the victim merely walked to Haggblom's door and put her hand on the child's gate. No reasonable person would conclude that the victim provoked Muneca. As the superior court noted, "it is impractical to argue that a person must anticipate each and every peculiarity of every animal he or she is exposed to and, if they guess wrong, they are at fault for provoking the animal."

 A law may also be deemed vague when it shows potential for arbitrary or selective enforcement.[22] If a statute or ordi-

---

18. *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004).

19. *R.R. v. State*, 919 P.2d 754, 758 (Alaska 1996) (citing *Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979)). A third factor, not relevant to the case at hand, applies only where the statute or ordinance in question is alleged to chill the exercise of First Amendment rights. *Id.*

20. *Summers*, 589 P.2d at 867–68 (quoting *Larson v. State*, 564 P.2d 365, 372 (Alaska 1977)) (holding that statute was not unconstitutionally vague when appellants' behavior fell within "hard core" of statute so that they had notice of prohibited behavior, and when appellants presented no

evidence of previous arbitrary enforcement of statute).

21. *See id.* at 868 ("It is sufficient to note that 'even if the outermost boundaries of (the challenged statute) may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973))).

22. *Id.; see also Levshakoff v. State*, 565 P.2d 504, 507 (Alaska 1977) (holding that appellant could not assert claim that statute did not give fair

nance is so imprecise that it "confers upon ... law enforcement personnel undue discretion in determining what constitutes the crime," it can be held void for vagueness.[23] A law will not be invalidated merely because it shows a potential for arbitrary enforcement; there must be evidence of a history of arbitrary application.[24]

■ Haggblom contends that the superior court's consolidation of the trial with the preliminary injunction hearing prevented her from seeking evidence regarding past enforcement of the ordinance. As a preliminary matter, the city argues that Haggblom waived this argument when her attorney stated at the preliminary injunction hearing that "we've probably put in almost all the evidence that would come in in this case." We agree with Haggblom that the argument was not waived. The attorney did not make a definite statement, instead using the qualifying terms "probably" and "almost." Furthermore, the attorney could not have known the weight that would be given to her words, because the superior court gave no notice that the hearing might be consolidated with the trial. Haggblom's attorney made an abstract statement about evidence; she did not ask the court to consolidate, nor did she agree to consolidate. Thus, fairness dictates consideration of Haggblom's argument.

■ Haggblom makes two specific assertions to support her claim that there is a history of arbitrary enforcement of the ordinance, neither of which is persuasive. First, Haggblom claims that CSO Peters conceded that, when enforcing the ordinance, he "arbitrarily" decides whether an animal has acted with provocation. This misstates Peters' actual statement: In response to the question, "isn't it true that you're basically determining what provocation is[,] based on your own judgment?" Peters answered "yes."

notice of prohibited conduct because his conduct fell within "hard core" of the statute, but nevertheless considering his argument that the statute was capable of arbitrary enforcement).

**23.** *Levshakoff,* 565 P.2d at 507.

**24.** *Id.* at 507–08.

It is hardly surprising that a law enforcement officer uses his judgment in applying the law. This does not constitute arbitrary action, and acknowledgment that one uses one's own judgment is hardly a concession of arbitrary action. We have already determined that the meaning of "without provocation" is sufficiently clear in the statute, and that Muneca's actions fall within the phrase's plain meaning. Further, as we have previously held, "[e]nforcement of criminal laws of necessity involves some degree of discretion."[25] This principle certainly applies to the enforcement of municipal ordinances.

■ Haggblom next asserts that the she was given the option to remove Muneca from within city limits rather than have her euthanized, and that because this option of banishment is not explicitly provided for in the ordinance, the ordinance was arbitrarily enforced. This action fails, however, to show any arbitrariness in determining what constitutes provocation. Instead, it shows only that, after correctly determining that Muneca's actions fit the description of the prohibited conduct, the city extended to Haggblom a less severe consequence than is normally provided by the ordinance. This showing of leniency came after a determination, on the evidence, that Muneca qualified as a "vicious" animal under the terms of the ordinance. Showing leniency does not demonstrate arbitrary enforcement.

■ In addition to these two allegations of specific examples of arbitrary enforcement in this case, Haggblom also claims that if she had been given an adequate opportunity to conduct discovery she would have unearthed bite reports from previous years that would have revealed a history of arbitrary enforcement of the ordinance. As stated above, we will construe an ordinance narrowly to avoid a finding of unconstitutionality.[26] We will not hold a statute void for vagueness if the statute has been shown to have a "plainly legitimate sweep."[27] In this case, we have

**25.** *Larson,* 564 P.2d at 372.

**26.** *Treacy v. Municipality of Anchorage,* 91 P.3d 252, 260 n. 14 (Alaska 2004).

**27.** *See id.* (holding that juvenile curfew ordinance was not void for vagueness because "despite any occasional problems it might create in

already established that the facts fall within the "hard core" of the ordinance,[28] and that there was no arbitrary enforcement of the ordinance. This conclusion demonstrates the legitimate sweep of the ordinance. Therefore, although we acknowledge the possibility that, had she been allowed more time, Haggblom may have been able to unearth a case showing arbitrary enforcement of the statute on the margins, such a finding could not have altered our conclusion that the ordinance has a plainly legitimate sweep, and that the undisputed facts in this case fall within the core of the statute. We do not need to consider at this time whether the ordinance is capable of, or has been subject to, arbitrary enforcement in cases that fall outside of the legitimate, solid core of the ordinance.

Because the ordinance provides adequate notice of the prohibited conduct and the language of the ordinance is sufficiently precise, we conclude that DMC 07.07.030 is not unconstitutionally vague.

### B. The Superior Court Did Not Err in Consolidating the Hearing on Preliminary Injunctive Relief with a Trial on the Merits.

 Alaska Civil Rule 65(a)(2), based on Rule 65 of the Federal Rules of Civil Procedure, provides that "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." We have not addressed Rule 65(a)(2) directly, but the United States Supreme Court has held that "the parties should normally receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." [29]

The superior court here did not indicate either before or during the preliminary injunction hearing that it was consolidating the hearing with a trial on the merits.[30] The first notice to the parties that the proceedings were consolidated was in the court's "Order On Preliminary Injunction," in which it held that the ordinance was constitutional and the city's decision was supported by substantial evidence.

 The city argues that notwithstanding the general requirement of notice, "the court's discretion should not be overturned on appeal absent a showing of substantial prejudice in the sense that a party was not allow[ed] to present material evidence." This proposition finds support in federal case law. When a court orders consolidation during the course of a preliminary injunction hearing, a "party contesting the entry of final judgment at the preliminary injunction stage ... must demonstrate prejudice as well as surprise." [31] In addition, "if it is clear that consolidation did not detrimentally affect the litigants, as, for example, when the parties in fact presented their entire cases and no evidence of significance would be forthcoming at trial, then the trial court's consolidation will not be considered to have been improper." [32]

 Courts will uphold consolidation of proceedings when the preliminary injunction hearing was sufficiently thorough to remove any risk of prejudice.[33] The sufficiency of the proceedings is determined on a case by

---

its application to specific cases, the ordinance has a plainly legitimate sweep").

**28.** *See Summers v. Anchorage,* 589 P.2d 863, 868 (Alaska 1979).

**29.** *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (alteration in original) (quoting *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.,* 463 F.2d 1055, 1057 (7th Cir.1972)).

**30.** During the hearing, the court and parties referred to the proceeding as a preliminary injunction hearing.

**31.** 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2950 (2d ed.1995).

**32.** *Id.*

**33.** *See AM Gen. Corp. v. DaimlerChrysler Corp.,* 246 F.Supp.2d 1030, 1033–35 (N.D.Ind.2003) (holding that findings and conclusions of law made at preliminary injunction hearing can have preclusive effect).

case basis.[34] Here, the superior court heard arguments from both parties, and ruled on all of the issues before it. Haggblom must show that she suffered prejudice because she was denied a chance to present evidence that would allow her to prevail at trial.[35]

Haggblom asserts that she could have presented additional evidence regarding vagueness had there been a trial on the merits. She points to a transcript of a Dillingham City Council meeting in which concern was expressed that important terms in DMC 07.07.030 were not defined. But the only examples cited were of animal activity at the margins of the ordinance.[36] She also notes that had there been discovery she could have requested records of prior enforcement of the ordinance to determine whether it had been enforced unevenly. Finally, she asserts that given more time her animal behavior expert could have evaluated Muneca.

We have already addressed the vagueness question above, determining that the term "provocation" is sufficiently clear as applied in this case where, without any warning or provocation, the dog bit a person, leaving two puncture wounds and bruising. The opinions of one unidentified city council member and one public member to the contrary are unpersuasive and irrelevant to this inquiry. We have also already determined that the ordinance has a legitimate sweep and that the facts of this case fall within the solid core of the statute, thus negating the probative value of any previous instances of allegedly arbitrary enforcement of the ordinance at the margins. We are similarly unpersuaded that the testimony of an animal behavior expert not present at the time of the bite could have made any difference in the trial court's final conclusions. The ordinance clearly lays out the requirements that must be met for a determination of viciousness. The testimony

of the only two witnesses to the incident, Haggblom and Simpson, is sufficient to support a conclusion that these requirements were met in this instance. Because Haggblom has not shown that there was any additional evidence of significance that would have been forthcoming at trial that could have allowed her to prevail, we conclude that the consolidation of the proceedings did not prejudice Haggblom and therefore there was no error.

## V. CONCLUSION

Because the ordinance did not violate Haggblom's due process rights, the city did not violate Haggblom's due process rights in applying the ordinance, and the superior court did not err in consolidating the hearing on preliminary injunctive relief with the trial on the merits, we AFFIRM the superior court's judgment in all respects.

BRYNER, Justice, not participating.

EASTAUGH, Justice, concurring.

Dillingham's vicious animal ordinance and the administrative and lower court appellate proceedings are remarkably problematic. Because Haggblom has not demonstrated that these problems actually prejudiced her attempt to protect her dog, Muneca, I concur in the result reached today, but write separately to call attention to deficiencies in the ordinance, its administrative enforcement, and the superior court appeal.

My comments are not driven by undue sympathy for Muneca or her owner. The evidence permits an objective fact finder to find that Muneca bit Simpson without provocation. Even though the bite was minor,[1] the dog's undisputed conduct places Muneca squarely within the class of animals subject to Dillingham's legitimate interest in public

---

**34.** *Id.* (holding that sufficiency of proceedings will depend on specific circumstances of hearing at issue).

**35.** *See* WRIGHT, MILLER & KANE, *supra* note 31.

**36.** One speaker expressed concern that her dog, a large Malamute, might inadvertently knock a child over while trying to show affection for the child. One council member agreed that "some of these definitions probably should be defined."

**1.** CSO Gary Peters described the bite as "a small puncture wound just above the middle finger knuckle that just broke the skin, and there was some bruising there too." CSO Peters's incident narrative states that "[he] asked if [Simpson] was going to seek medical assistan[ce] [and Simpson] said that she didn't think it was that bad."

safety. It also makes Muneca subject to appropriate sanctions under any well-drafted ordinance.

But today's opinion implies that there is nothing wrong with Dillingham's ordinance, in the way Dillingham applied it to Muneca, or in the way the superior court appeal proceeded.[2] These implications require response.

**The ordinance.** Dillingham's animal control ordinance contains sixteen chapters, only one of which is implicated here. Chapter 7 deals with "nuisance" animals,[3] "dangerous" animals,[4] and "vicious" animals.[5] Muneca was found to be a vicious animal. The ordinance does not define "vicious"[6] as such, but classifies as vicious any animal that bites a person or animal without provocation (or gives an indication it "is able" to bite without provocation).[7] Vicious animals are to be euthanized within forty-eight hours, following any necessary quarantine period.[8] The issues at any appeal hearing for an animal that allegedly bit without provocation are strictly limited to whether the animal bit a person or another animal and whether the bite was without provocation.[9]

Its length may imply that Dillingham's animal control ordinance is comprehensive. But comparison with the animal control ordinance we recently reviewed in *West v. Municipality of Anchorage*[10] reveals that Dill-

---

**2.** *See* Op. at 997–98, 998–1000.

**3.** Dillingham Municipal Code (DMC) 07.07.010 (2006).

**4.** DMC 07.07.020.

**5.** DMC 07.07.030 provides in part:
 A. Any animal who bites a person or animal without provocation, or which, by its actions, gives indication that it is able to bite any person or animal without provocation, shall be deemed vicious.
 B. Any animal who bites a person or animal without provocation and is currently vaccinated, shall be immediately quarantined for no less than ten days at the expense of the owner. A date of euthanasia for the animal shall be scheduled for no less than forty-eight hours after completion of quarantine.
 C. Any animal who bites a person or animal without provocation and is unvaccinated, shall be immediately impounded and quarantined for no less than ten days at the expense of the owner or keeper, and the owner or keeper may be found in violation of Chapter 7.13, subject to fees and/or fines established within Sections 7.16.010 and 7.16.020, and to comply with Chapter 7.14. Before completion of quarantine, the owner or keeper will be given a written notice of the date of euthanasia. A date of euthanasia shall be scheduled for no less than forty-eight hours after completion of quarantine.
 D. Vicious animals shall be euthanized, as established in Section 7.11.010, by the community service officer or agent not less than forty-eight hours after providing actual written notice to the owner or keeper of the dog, by hand delivery to the owner or keeper, or by posting at the last known residence of the owner or keeper. Such notice shall advise the owner or keeper of the following:
 1. Planned time of euthanization of the animal;
 2. That the animal will be impounded and/or quarantined immediately upon issuance of notice;
 3. That the owner or keeper has an opportunity to be heard before the city manager, or the city manager's designee, should they wish to appeal the community service officer's or agent's determination that the animal is vicious.

**6.** DMC 07.02.010 defines "nuisance animal" and more than thirty other words or terms, but not "dangerous animal" or "vicious animal."

**7.** DMC 07.07.030(A).

**8.** DMC 07.07.030(B)-(C).

**9.** DMC 07.07.030(E). Subsection E states:
 The issues to be considered at any appeal hearing shall be limited to the following:
 1. Whether the animal bit a person or domestic animal;
 2. Whether the animal caused damage to property;
 3. Whether the bite or damage was without provocation;
 4. Whether the animal by its actions, gave indication that it is able to bite any person or animal without provocation.

**10.** *West v. Municipality of Anchorage*, 174 P.3d 224 (Alaska 2007) (discussing Anchorage Municipal Code (AMC) 17.40.010–.100, which provides five levels of animal behavior classification and corresponding animal restrictions ranging from leashing requirements to euthanasia); AMC 17.40.020(A)(4) (Level four behavior "is established if any of the following occur: a. An unrestrained animal inflicts an aggressive bite or causes physical injury to any human; or b. An unrestrained animal kills a domestic animal that is restrained; or c. An animal, regardless of whether it is restrained, for the second time injures or kills a domestic animal.").

ingham's ordinance provides an inflexible and arbitrary process for dealing with animals that bite without provocation. The Anchorage ordinance contains five behavioral classifications, three of which distinguish between an animal that "bites," an animal that inflicts an "aggressive bite," and an animal that causes "serious physical injury."[11] It also lists eight types of exceptions.[12] And in addition to euthanasia, it describes a broad range of lesser restrictions for three of the classification levels that presuppose unexcepted biting.[13]

In comparison, Dillingham treats all animals inflicting unprovoked bites the same, classifying them as "vicious."[14] In theory it requires that they all be euthanized.[15]

Dillingham's vicious animal ordinance has two particular deficiencies.

First, it provides no functional standards for distinguishing vicious animals from non-vicious animals. The ordinance does not distinguish between the horse that playfully or mistakenly nips someone giving it a carrot and the dog that escapes its yard and mauls a child. It does not distinguish between animals indisputably vicious and those indisputably not. It contains no standards that tell enforcers how to administer the ordinance in practice; it likewise does not tell those subject to enforcement how to determine whether their animal is vicious and exposed to euthanasia. This means owners have no announced standards to guide them in deciding whether and how to dispute a viciousness classification and oppose the animal's destruction. Likewise, the ordinance contains no standards distinguishing those animals subject to the city's legitimate interest in safety from those that are not. It similarly contains no standards distinguishing those animals requiring the most severe sanction from those for which destruction is not needed, and for which destruction is not a rational or permissible governmental response.

An animal whose bite is unprovoked is vicious, per DMC 07.07.030(A). But there is no standard for determining provocation. Is throwing a stone or pulling an animal's tail provocation? Is a sudden move to pat the head of a growling dog or a skittish horse? Is teasing a dog with a biscuit or a horse with a carrot? Does it matter whether the victim is a child or an adult? Provocation sufficient to excuse a minor nip might not be sufficient to excuse a mauling. Determining whether there was provocation may be particularly difficult if one animal bites another, as when a chance meeting escalates from mutual sniffing to mutual biting.

Second, the ordinance fails to take into account the severity of the bite. There is no rational reason why the ordinance requires the same penalty—euthanasia—for the dog that nips and the dog that mauls.

As we will see, there is evidence the city does draw distinctions when it enforces the ordinance: its officers decide whether an animal is vicious and whether a sanction other than death is possible. But they do so without any published standards to be found in the ordinance and without any rational standards explained in this case.

Haggblom challenges the ordinance as vague. I agree, to the extent viciousness depends on whether an animal acted without provocation. But the ordinance is not otherwise vague: it is specific in describing the animals to which it applies (all those that bite or might bite); it treats all animals that bite the same. This sweeping specificity does not save its impermissible scope. Even if they are unprovoked, it is arbitrary to treat all biting animals the same.

**Enforcement.** Haggblom complains of arbitrary enforcement; she unsuccessfully sought to conduct discovery on the topic.

Her arbitrary enforcement complaint seems well-taken. The city, in enforcing the ordinance, appears to distinguish on an ad hoc basis between animals its officers consid-

---

11. AMC 17.40.020(A)(2)-(5).

12. AMC 17.40.020(B).

13. AMC 17.40.040.

14. DMC 07.07.030(A).

15. DMC 07.07.030(B)-(C).

er vicious and those they do not.[16] The latter are apparently not cited at all.[17] The former are theoretically subject to the only sanction the ordinance permits: death. Despite this ostensible lack of discretion in choosing a remedy, there is evidence enforcement officers do exercise discretion as to sanction. They decide whether death is required, or whether to allow the owner to ship the animal out of the city. In choosing to apply the ordinance to some animals that have bitten a person and not to others, the city acts arbitrarily,[18] because the ordinance confers no enforcement discretion to the city and contains no standards by which enforcing officers can make reasoned decisions to apply sanctions to one animal that has bitten and not to another.[19]

Perhaps in practice city officers have accurately distinguished between animals that need to be regulated and those that don't. And perhaps they have also accurately decided which animals might, like thieves in Nineteenth–Century England, be offered transportation to distant shores as an alternative to death.[20] But there is no assurance the enforcement classification for any given ani-

mal is valid, because the ordinance contains no standards for determining the validity of the classification. As a result, enforcement officers, animal owners, those trying to decide whether to dispute administrative enforcement, those appealing administrative decisions, and appellate judges are all without guidance. Even assuming that the only rights implicated are the owners' property rights, arbitrary interference with · those rights is likely.[21] It is no consolation that some dogs may, by meeting unspecified criteria, avoid death if they are offered "blue tickets" out of the city.[22] Such an offer may spare an animal's life, but makes it impossible for the owner who remains in Dillingham to exercise most property rights, let alone any arguably more-important rights arising out of the animal's companionship.

It is also probable some animals will be euthanized that could, if their owners appealed, satisfy the city's unpublished standards for banishment: the absence of published standards makes it hard for an owner to decide rationally whether the cost of defending the animal is worth the risk the defense will be fruitless. The absence of standards

**16.** CSO Peters testified that his animal control training included "some ride-alongs with the sergeants showing [him] what to do and going over the city ordinances and reading them" and that he "attended National Animal Control Association classes." Because DMC 07.07.030 does not contain standards for administration, effective application of this training to animal behavior classification seems impossible.

**17.** DMC 07.07.030(C)-(D) (owner of vicious animal to be provided notice of euthanasia date); DMC 07.07.020(D) (community service officer may issue citation or warning to owner of dangerous animal).

**18.** Under DMC 07.07.030 an animal that is deemed vicious must be euthanized. But it appears that Chief Richard Thompson sometimes offers owners alternatives to euthanasia. Chief Thompson testified in superior court that Muneca would not be euthanized if Haggblom shipped Muneca out of Dillingham:

Q ... Did you talk to her about the option of having the dog shipped out of Dillingham?
A Yes, ma'am.
Q And in your mind, that was a possible option for [Muneca] as a result of your....
A That was one possible option, yes.

Chief Thompson did not give a reason for deviating from the only sanction required or permitted by the ordinance and he did not describe what

other "possible" options to euthanasia are available.

**19.** Ending this exercise of discretion will not save the ordinance, which is arbitrary in requiring euthanasia for all animals that inflict unprovoked bites.

**20.** See generally Schick v. Reed, 419 U.S. 256, 261–62, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974) (discussing banishment as punishment); see also United States v. Blake, 89 F.Supp.2d 328, 341–43 (E.D.N.Y.2000) (providing historical discussion of criminal rehabilitation and noting England banished prisoners to "the American Colonies and ... Australia"); Robert Hughes, The Fatal Shore: The Epic of Australia's Founding (1987).

**21.** See generally Susan J. Hankin, Not a Living Room Sofa: Changing the Legal Status of Companion Animals, 4 Rutgers J.L. & Pub Pol'y 314, 343 (2007) (noting "courts have actually been willing to entertain the idea that animals are in a different legal category from inanimate property").

**22.** See generally Mike Doogan, How To Speak Alaskan 14 ("BLUE TICKET–A one way passage out of Alaska, awarded in earlier times to suspected criminals and other undesirables by the authorities.").

particularly impedes those owners financially or intellectually least able to defend their animals or find them new and distant homes if the defense fails.

As it turns out, the danger of arbitrary enforcement does not help Haggblom: there is no reasonable dispute that Muneca is validly subject to regulation; the evidence permitted a finding that Muneca was not provoked and Haggblom produced no contrary evidence; Haggblom has not argued that the bite was not serious enough to justify euthanasia or banishment; and Chief Thompson's offer of a blue ticket out of Dillingham removes the threat of the most serious possible consequence, unjustified euthanasia. Nor has Haggblom asserted that she is financially unable to defend Muneca or save her life by shipping her away.

**Appeal.** Haggblom argues that the procedure followed in her superior court appeal deprived her of the opportunity to conduct discovery and present expert testimony. Haggblom correctly asserts that the superior court converted the preliminary injunction hearing into a de novo trial on appeal without giving advance notice of its intention. That procedure was problematic because consolidation under Alaska Civil Rule 65(a)(2) "must be tempered by the due process principle that fair notice and an opportunity to be heard must be given the litigants before the disposition of a case on the merits." [23]

In my view, it was error to treat the preliminary injunction hearing as a trial without giving prior notice of that intention. But Haggblom has not demonstrated that this error was prejudicial. Her lawyer stated at the hearing that "we've probably put in almost all of the evidence that would come in in this case and if we're—it was listed as a preliminary injunction hearing. We would ask for a preliminary injunction and eventually we'll be asking that the ordinance be set aside." And she did not seek reconsideration

with a proffer of relevant evidence. She was not obliged to seek reconsideration to reserve the issue, but she was obliged to let the superior court know that she objected to resolving the case on the merits without being able to offer relevant evidence. Had she made that objection, accompanied by either an offer of proof or an explanation how discovery would be relevant to Muneca's case, the error here would have required reversal. But absent any such objection, we have no basis for holding that this procedural error harmed her.

**Expert evidence.** Today's opinion states that no animal behavior expert who was not present when Muneca bit Simpson could have offered evidence that would have made a difference in the trial court's conclusions.[24] Some readers might read this statement to express an opinion that an expert could offer no relevant information. But an expert in animal behavior who was not present might, by responding to hypothetical questions, offer relevant opinions regarding the animal's alleged viciousness. That topic would also be relevant to a challenge to the validity of the ordinance on the theory it arbitrarily treats non-vicious animals as vicious. An expert could also discuss what circumstances would amount to provocation for a non-vicious animal. And after examining the animal, an expert could also offer opinions about its potential for unwarranted and unprovoked biting, evidence tending to show whether the bite was in fact provoked. This evidence would also be relevant to a contention euthanasia is not a rational sanction for the subject animal. Haggblom did not offer the evidence for any of these purposes, but that does not mean an expert in such a case could say nothing that might affect the outcome.

**Conclusion.** The undoubted legitimacy of Dillingham's interest in preventing unprovoked dog bites is subject to requirements of fair notice and an opportunity to be heard. The deficiencies in the ordinance, its enforce-

**23.** 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2950 (2d ed.1995) (citing *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055 (7th Cir.1972)). This treatise suggests that "[a]lthough each case will depend on its own circumstances, the ten-day notice requirement of Rule 56 for summary judgment motions might be taken as suggestive of the minimum amount of time necessary to permit a litigant to prepare a showing upon which the final outcome of the case may depend." *Id.*

**24.** Op. at 1000.

ment, and the appeal would require reversal if they were not deemed harmless.

