*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MADILYN SHORT, RILEY VON BORSTEL, KJRSTEN SCHINDLER, and JAY-MARK PASCUA, | ) ) ) | Supreme Court No. S-18333 |
| | ) | Superior Court No. 3AN-22-04028 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7622 – September 30, 2022 |
| STATE OF ALASKA, OFFICE OF MANAGEMENT & BUDGET and DEPARTMENT OF ADMINISTRATION; and GOVERNOR MICHAEL J. DUNLEAVY, in an official capacity, | ) ) ) ) ) ) | |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Jahna M. Lindemuth, Scott M. Kendall, and Samuel G. Gottstein, Cashion Gilmore & Lindemuth, Anchorage, for Appellants. Katherine Demarest and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees. Kevin Cuddy, James E. Torgerson, and Connor R. Smith, Stoel Rives LLP, Anchorage, for Amicus Curiae Alaska Legislative Council.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

WINFREE, Chief Justice.

# I. INTRODUCTION

Alaska's annual budgetary "sweep" is a constitutionally mandated process requiring certain unappropriated funds to be placed in the Constitutional Budget Reserve (CBR), akin to a State savings account. A decade ago the Legislature created and funded the Higher Education Investment Fund (HEIF) to provide annual grants and scholarships to students pursuing post-secondary education in Alaska. The HEIF later was identified as potentially eligible for a sweep of its unappropriated funds. After the Legislature failed in 2021 to garner the supermajority vote required to prevent the sweep, a group of students (the Students) sued the Governor in his official capacity, the Office of Management and Budget (OMB), and the Department of Administration (collectively the Executive Branch), alleging that the HEIF was not sweepable. The superior court agreed with the Executive Branch, and the Students appeal. Because a previous case interpreting the constitutional provision governing the CBR controls and we decline to reject that precedent, we affirm the superior court's determination that the HEIF is sweepable.[1]

# II. LEGAL BACKGROUND

## A. Appropriations In Alaska

The power to appropriate state funds is vested in the legislature.[2] But the

---

[1] This appeal was expedited and immediately after oral argument we issued a summary order affirming the superior court's decision, with an explanatory decision to follow. *Short, et al. v. Dunleavy, et al.*, No. S-18333 (Alaska Supreme Court Order, May 3, 2022). This is the explanatory decision.

The legislature has since amended the HEIF statute, removing the HEIF from the general fund and thus making it ineligible for the sweep. Ch. 15, § 3 SLA 2022. Our decision reflects the statutes in place during the proceedings underlying this appeal.

[2] Alaska Const. art. IX, § 12 (instructing governor to submit appropriation

(continued...)

Alaska Constitution imposes limits on that appropriation power and the State's power to spend generally. Article IX, section 13 prohibits expenditures "from the treasury except in accordance with appropriations made by law." Article IX, section 16 caps annual spending in certain situations. Article IX, section 7, the anti-dedication clause, prohibits the dedication of "any state tax or license" to "any special purpose." And Article II, section 15 authorizes the governor to "by veto, strike or reduce items in appropriation bills." We recently stated that the Constitutional structure is based on an annual appropriations model.[3]

### B. The CBR And Relevant Case Law

#### 1. The CBR was established in 1990.

As another limit on the State's spending power, in the 1990 general election voters amended the Alaska Constitution by adopting article IX, section 17[4] establishing

---

[2]      (...continued)
bill and anticipated budget to legislature); Alaska Const. art. II, § 13 (providing that "[b]ills for appropriations shall be confined to appropriations"); *see also Alaska Legis. Council v. Knowles*, 21 P.3d 367, 371 (Alaska 2001) (noting Alaska Constitution "gives the legislature the power to legislate and appropriate" (footnote omitted)).

[3]      *See State v. Alaska Legis. Council, et al.*, ___ P.3d ___, Op. No. 7612, 2022 WL 3331488 (Alaska Aug. 12, 2022) (holding legislature's forward funding appropriation of future fiscal year monies unconstitutional because constitution requires annual appropriations); *cf. Sonneman v. Hickel*, 836 P.2d 936, 938 (Alaska 1992) ("But if allocation is permitted for one interest the denial of it to another is difficult, and the more special funds are set up the more difficult it becomes to deny other requests until the point is reached where neither the governor nor the legislature has any real control over the finances of the state." (quoting 6 Proceedings of the Alaska Constitutional Convention App. V at 111 (Dec. 16, 1955))).

[4]      1990 Legislative Resolve No. 129 (S.J.R.5); *see Hickel v. Halford*, 872 P.2d 171, 173 (Alaska 1994). Section 17 "was placed on the ballot after being passed by a legislative resolution approved by a two-thirds vote of each house of the 1990 (continued...)

the Budget Reserve Fund, commonly known as the CBR.[5]   Section 17 was

---

**4**   (...continued)
legislature." *Id.*

**5**   Section 17 states in full:

(a) There is established as a separate fund in the State treasury the [CBR].  Except for money deposited into the permanent fund under Section 15 of this article, all money received by the State after July 1, 1990, as a result of the termination, through settlement or otherwise, of an administrative proceeding or of litigation in a State or federal court involving mineral lease bonuses, rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments or bonuses, or involving taxes imposed on mineral income, production, or property, shall be deposited in the [CBR].  Money in the [CBR] shall be invested so as to yield competitive market rates to the fund.  Income of the fund shall be retained in the fund. Section 7 of this article does not apply to deposits made to the fund under this subsection. Money may be appropriated from the fund only as authorized under (b) or (c) of this section.

(b) If the amount available for appropriation for a fiscal year is less than the amount appropriated for the previous fiscal year, an appropriation may be made from the [CBR]. However, the amount appropriated from the fund under this subsection may not exceed the amount necessary, when added to other funds available for appropriation, to provide for total appropriations equal to the amount of appropriations made in the previous calendar year for the previous fiscal year.

(c) An appropriation from the [CBR] may be made for any public purpose upon affirmative vote of three-fourths of the members of each house of the legislature.

(d) If an appropriation is made from the [CBR], until the

(continued...)

enacted as "a response to a perceived impending fiscal crisis resulting from a growing gap between State spending levels and general fund revenues."[6] Its purpose "was to remove certain unexpected income from the appropriations power of the legislature[] and to save that income for future need."[7] The superior court succinctly described the constitutional provision: "[S]ection 17 created a government savings account accessible by the legislature under two circumstances; however, any money withdrawn from the CBR must be repaid."

Section 17 has four subsections. Subsection (a), establishing the CBR and its funding sources, instructs that "[m]oney may be appropriated from the fund only as authorized under" subsections (b) or (c).[8] Subsection (b) authorizes appropriations by a majority vote of both houses of the legislature "[i]f the amount available for appropriation for a fiscal year is less than the amount appropriated for the previous fiscal year."[9] Subsection (c) authorizes appropriations "for any public purpose upon affirmative vote of three-fourths of the members of each house of the legislature."[10] Subsection (d), the focus of this appeal, requires that money withdrawn from the CBR be repaid with "money in the general fund available for appropriation at the end of each

---

[5]     (...continued)
        amount appropriated is repaid, the amount of money in the general fund available for appropriation at the end of each succeeding fiscal year shall be deposited in the [CBR]. The legislature shall implement this subsection by law.

[6]     *Halford*, 872 P.2d at 177 n.9.

[7]     *Id.* at 177 (footnote omitted).

[8]     Alaska Const. art. IX, § 17(a).

[9]     *Id.* § 17(b); *see id.* art. II, § 14.

[10]    *Id.* art. IX, § 17(c).

succeeding fiscal year."[11]  It also instructs:  "The legislature shall implement this subsection by law."[12]

The repayment provision in subsection 17(d) is known as the "sweep"; excess money in State general fund accounts at the end of each fiscal year is "swept" into the CBR.  The legislature frequently uses its subsection 17(c) power to offset the sweep by a three-fourths vote passing a "reverse sweep."  When a reverse sweep occurs, the money withdrawn from the general fund accounts and swept into the CBR at the end of one fiscal year is immediately appropriated back out of the CBR at the beginning of the next fiscal year and returned to the general fund accounts from which it came.  As the Director of the Office of Management and Budget explained:  "When the reverse sweep passes, the only 'sweep' that occurs is an accounting event involving a reconciliation of accounts for the end of a fiscal year."

### 2. *Hickel v. Cowper* held that legislative enactment of section 17 was unconstitutional.

In 1994 the legislature enacted AS 37.10.420, attempting to define terms article IX, section 17 uses, including "amount available for appropriation";[13]

---

[11]  *Id.* § 17(d).

[12]  *Id.*

[13]  AS 37.10.420(a)(1) (defining "amount available for appropriation" and "funds available for appropriation" as "(A) the unrestricted revenue accruing to the general fund during the fiscal year; (B) general fund program receipts as defined in AS 37.05.146; (C) the unreserved, undesignated general fund balance carried forward from the preceding fiscal year that is not subject to the repayment obligation imposed by art. IX, [§] 17(d) . . .; and (D) the balance in the statutory budget reserve fund established in AS 37.05.540").

subsections (b) and (d) both use the phrase "available for appropriation."[14]

When AS 37.10.420 was challenged the superior court found it unconstitutional; the State petitioned for our review.[15] The primary issue before us was "the meaning of the term 'amount available for appropriation' as used in article IX, [sub]section 17(b)."[16] After considering the subsection's plain language, its purposes, its legislative history, and contemporaneous evidence about voters' understanding of the constitutional amendment, we concluded:

> [T]he "amount available for appropriation" within the meaning of article IX, section 17 of the Alaska Constitution includes all monies over which the legislature has retained the power to appropriate and which require further appropriation before expenditure. In addition, all amounts actually appropriated, whether or not they would have been considered available prior to appropriation, are available within the meaning of section 17.[17]

We accordingly held that AS 37.10.420(a)(1)'s contrary definition of "amount available for appropriation" was unconstitutional.[18]

---

[14]     *See* Alaska Const. art. IX, § 17(b) ("If the *amount available for appropriation* for a fiscal year is less than the amount appropriated for the previous fiscal year, an appropriation may be made from the [CBR]." (emphasis added)); *id.* § 17(d) ("If an appropriation is made from the [CBR], until the amount appropriated is repaid, the *amount of money in the general fund available for appropriation* at the end of each succeeding fiscal year shall be deposited in the [CBR]." (emphasis added)).

[15]     *Hickel v. Cowper*, 874 P.2d 922, 924-25 (Alaska 1994).

[16]     *Id.* at 926.

[17]     *Id.* at 935.

[18]     *Id.*

We elaborated that the "amount available for appropriation" included "trust receipts, 'restricted' accounts within the general fund which require further legislative appropriation before they can be expended, and the permanent fund earnings reserve account."[19] We further explained that funds like those for Railbelt energy, Alaska marine highway system vessel replacement, and educational facilities maintenance and construction all were "available for appropriation" within the meaning of section 17(b) because, although they were established as "restricted funds" within the general fund and consisted of money appropriated to them by the legislature, further legislative appropriations were necessary to support any expenditures from the funds.[20] But we explained that the oil and hazardous substance release response fund was not available for appropriation because the legislature had made the entire fund available for expenditure without requiring further legislative action.[21]

We also considered the constitutionality of AS 37.10.420(b), designating the means for repaying the CBR under article IX, section 17(d) (the "sweep" provision).[22] The statute read:

> If the amount appropriated from the [CBR] has not been repaid under [subsection 17(d)], the Department of Administration shall transfer to the [CBR] the amount of money comprising the *unreserved, undesignated general fund balance* to be carried forward as of June 30 of the fiscal year, or as much of it as is necessary to complete the repayment. The transfer shall be made on or before

---

[19] *Id.*

[20] *Id.* at 936.

[21] *Id.* at 933.

[22] *Id.* at 936.

December 16 of the following fiscal year.[23]

Notably, the "unreserved, undesignated general fund balance" language was the same as that used in AS 37.10.420(a)(1) to define "amount available for appropriation" under subsection 17(b).[24] With respect to AS 37.10.420(b), we determined that the statutory definition applicable to section 17(d) incorrectly "exclude[d] restricted funds within the general fund from the calculation of the amount available to pay back appropriations from the [CBR]."[25] We stated: "[S]ome of these funds remain 'available for appropriation' within the meaning of section 17."[26] We saw "no reason to give 'available for appropriation' a different meaning in subsection (d) than we did in subsection (b)," though we noted that only monies in the general fund were subject to the sweep.[27] Alaska Statute 37.10.420(b) thus was unconstitutional because it "fail[ed] to consider all amounts which [were] 'available for appropriation' within the meaning of section 17 in determining the State's repayment obligation."[28]

In *Cowper* we made a final point regarding future disputes: "The availability of funds not specifically discussed . . . must be determined in accordance with this opinion."[29] The parties nonetheless sharply disagree whether *Cowper* controls

---

[23]    AS 37.10.420(b) (emphasis added).

[24]    *Compare* AS 37.10.420(a)(1)(C), *with* AS 37.10.420(b).

[25]    *Cowper*, 874 P.2d at 936.

[26]    *Id.*

[27]    *Id.* at 936 n.32.

[28]    *Id.* at 936.

[29]    *Id.* at 935.

this case. Because the HEIF is housed within the general fund,[30] the core issue is not whether subsection 17(d) should be read to include certain restricted funds within the general fund because, as *Cowper* instructs, that is the correct reading.[31] Rather, the relevant questions are whether the HEIF, enacted after *Cowper*, is analogous to a restricted fund within the general fund and therefore is available for appropriation, and, if so, whether *Cowper* should be reconsidered and rejected.

## III. FACTS AND PROCEEDINGS

### A. Undisputed Facts

#### 1. The legislature established the HEIF in 2012.

The HEIF was established in 2012 to make payments supporting the Alaska

---

[30] *See infra* Part III.A.1 (explaining establishment of HEIF). The Students briefly seem to argue that the HEIF is not in the general fund: "Although the legislature by statute later created the HEIF as a subfund within the general fund, it is unlikely they were using the term 'general fund' in the same way as it was used in section 17(d)." The Executive Branch correctly notes that this "suggestion is meritless." There is only one general fund, and the HEIF was "established in the general fund" in 2012, over 20 years after the CBR amendment's adoption. *See* AS 37.14.750; *Hickel v. Halford*, 872 P.2d 171, 173 (Alaska 1994). We "presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect,' " and we "consider[] the meaning of the statute's language, its legislative history, and its purpose." *Roberge v. ASRC Constr. Holding Co.*, 503 P.3d 102, 104 (Alaska 2022) (first quoting *State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007); and then quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017)). The Students offer no reason we should interpret "general fund" as used in AS 37.14.750(a) to mean something different than the term used in article IX, section 17.

[31] *Cowper*, 874 P.2d at 936 (noting "some [restricted funds within the general fund] remain 'available for appropriation' within" context of subsection 17(d)).

Education Grant program and the Alaska Performance Scholarship program.[32] A $400 million appropriation designed to generate consistent investment returns initially funded the HEIF.[33] The Students describe the HEIF as akin to an endowment and cite legislative history suggesting the legislature may have intended the fund to function similarly.[34]

The statute creating the HEIF provides, among other things, that the fund "is established in the general fund,"[35] that "[m]oney in the fund does not lapse,"[36] and that the fund is not a dedicated fund.[37] The HEIF consists of "money appropriated to the fund," "income earned on investment of fund assets," "donations to the fund," and "money redeposited under AS 14.43.915(c)."[38] "As soon as practicable after July 1 of each year, the commissioner of revenue shall determine the [HEIF's] market value" as

---

[32]    Ch. 74, § 13, SLA 2012; AS 37.14.750 (establishing HEIF); *see* AS 14.43.400-.420 (Alaska Education Grant program); AS 14.43.810-.849 (Alaska Performance Scholarship program).

[33]    *See* ch. 5, § 20(f), FSSLA 2011 ("The sum of $400,000,000 is appropriated . . . to a fund created for the purpose of providing education grants or performance scholarships, or both, by the Twenty-Seventh Alaska State Legislature."); ch. 74, § 27, SLA 2012 ("The Alaska higher education investment fund established in AS 37.14.750, enacted by sec. 13 of this Act, is the fund identified in sec. 20(f), ch. 5, FSSLA 2011.").

[34]    *See* Statement of Jerry Burnett, Dir., Admin. Servs. Div., Dep't of Revenue at 9:45:27-9:51:56, Hearing on C.S.H.B. 104(RLS) Before the Sen. Fin. Comm., 27th Leg., 2d Sess. (Jan. 18, 2012) (explaining HEIF could be set up as endowment).

[35]    AS 37.14.750(a).

[36]    *Id.*

[37]    AS 37.14.750(b); *see* Alaska Const. art. IX, § 7 (prohibiting dedicating specific revenue to specific purposes).

[38]    AS 37.14.750(a)(1)-(4).

of June 30.[39]  The statute further requires that the commissioner identify 7% of the market value as "available for appropriation" to fund the Alaska Performance Scholarship and the Alaska Education Grant programs[40] and that the HEIF money may be appropriated to those accounts.[41]  Thousands of students receive money from each program each year.  At the end of 2021 the HEIF's net value was slightly less than $423 million.

The legislature recently has used the HEIF to fund programs other than the scholarship and grant programs it initially was created to fund.  The legislature has appropriated money from the HEIF to support the Washington-Wyoming-Alaska-Montana-Idaho (WWAMI) program, paying the out-of-state tuition difference for Alaska medical school students attending University of Washington, and Alaska's Live Homework Help program, providing students statewide free online tutoring.

**2.  The Executive Branch determined that the HEIF was sweepable.**

In July 2019 the legislature failed to achieve the required three-fourths vote to reverse the annual CBR sweep.  The OMB subsequently sent the legislature a letter identifying the funds to be swept into the CBR pursuant to section 17(d); the HEIF was on the list.  The legislature passed a reverse sweep later that month.[42]

In 2021, after appropriating money for fiscal year 2022, the legislature

---

[39]  AS 37.14.750(c).

[40]  *Id.*

[41]  AS 37.14.750(a).

[42]  *See* 2019 Sen. J. 1421-22; 2019 House J. 1339-40.

again failed to pass the reverse sweep and the HEIF again was identified for the sweep.[43] The Power Cost Equalization Endowment Fund (PCE), designed to "provid[e] a long-term, stable financing source for power cost equalization,"[44] also was identified for the sweep. But in August 2021 a superior court determined the PCE was not sweepable because article IX, section 17(d) mandates only that *general fund* monies be swept; the PCE, established as a "separate fund" of the Alaska Energy Authority, was not in the general fund.[45] The State did not appeal that decision.

After the PCE decision the Attorney General wrote a memorandum acknowledging that money already appropriated from the HEIF for fiscal year 2022 probably could be spent despite the appropriation having an effective date occurring after the sweep, and the Governor directed OMB to spend the money. But the Attorney General maintained the position that the HEIF's remaining corpus was subject to the sweep.

### B. Proceedings

The Students brought suit, arguing that because HEIF appropriations do not lapse, it was not sweepable. The Students' complaint was accompanied by a summary judgment motion.[46] The Executive Branch responded with a cross-motion for summary judgment, arguing that, under our case law and article IX, section 17's plain language, the HEIF was subject to the sweep. The Alaska Legislative Council filed an amicus brief

---

[43] *See* 2021 Sen. J. 1290-91; 2021 House J. 1318-19.

[44] Ch. 60, § 1, SLA 2000.

[45] *See* AS 42.45.070.

[46] *See* Alaska R. Civ. P. 56(c) (providing for summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law").

(and does so in this appeal), supporting the Students' argument that the HEIF is not subject to the sweep.[47]

The superior court observed that the HEIF was housed within the general fund and that the question was whether the HEIF was "available for appropriation" under *Cowper*. Agreeing with the Executive Branch that *Cowper*'s definition of "available for appropriation" controlled, the court rejected the Students' argument that *Cowper*'s definition was binding only when applied to article IX, section 17(b) but was dictum as applied to 17(d). *Cowper* instructed that "all monies over which the legislature has retained the power to appropriate and which require further appropriation before expenditure" are "available for appropriation."[48] The superior court concluded that the HEIF fell squarely within this definition. The court noted that AS 37.14.750(c) instructs the commissioner of revenue to "identify seven percent" of the HEIF's market value "as available for appropriation" and that under AS 37.14.750(a) funds require further appropriation to the grant and scholarship accounts before payment to students. The court further concluded that money already appropriated from the HEIF for fiscal year 2022 was not sweepable, in line with the Attorney General's August 2021 memorandum. The superior court granted summary judgment in the Executive Branch's favor.

The Students ask us to reverse the superior court on appeal.

## IV. STANDARD OF REVIEW AND CONSTITUTIONAL INTERPRETATION

" 'We review summary judgment rulings de novo and may affirm summary judgment on any basis appearing in the record.' 'Questions of constitutional and

---

[47] *See* AS 24.20.010 (recognizing legislature's need "for full-time technical assistance in accomplishing the research, reporting, bill drafting, and examination and revision of statutes, and general administrative services essential to the development of sound legislation in the public interest" and establishing Legislative Council).

[48] *Hickel v. Cowper*, 874 P.2d 922, 935 (Alaska 1994).

statutory interpretation . . . are questions of law to which we apply our independent judgment.' "[49]

> The appropriate approach to interpreting language in the Alaska Constitution is well established. "Constitutional provisions should be given a reasonable and practical interpretation in accordance with common sense. The court should look to the plain meaning and purpose of the provision and the intent of the framers."

>> Because of our concern for interpreting the [C]onstitution as the people ratified it, we generally are reluctant to construe abstrusely any constitutional term that has a plain ordinary meaning. Rather, absent some signs that the term at issue has acquired a peculiar meaning by statutory definition or judicial construction, we defer to the meaning the people themselves probably placed on the provision. Normally, such deference to the intent of the people requires "[a]dherence to the common understanding of words."[50]

## V.    DISCUSSION

### A.    The HEIF Is Sweepable Under *Hickel v. Cowper*.

#### 1.    Under our holding in *Hickel v. Cowper*, the HEIF is available for appropriation under subsection 17(b).

The Students contend that under subsection 17(d) the HEIF is not available

---

**49**    *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017) (footnote omitted) (first quoting *Seybert v. Alsworth*, 367 P.3d 32, 36 (Alaska 2016) and then quoting *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016)).

**50**    *Cowper*, 874 P.2d at 926 (citations omitted) (second alteration in original) (first quoting *ARCO Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992); and then quoting *Citizens Coal. for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 169 (Alaska 1991)).

for appropriation because the money already has been validly appropriated into the HEIF, citing our statement in *Cowper* that "monies which already have been validly committed by the legislature to some purpose should not be counted as available" because "any given sum of money can . . . be appropriated [only] once during a given time period."[51] The Council attempts to distinguish the HEIF from funds we found available for appropriation in *Cowper*,[52] specifically analogizing the HEIF to the oil and hazardous substance release response fund that in *Cowper* we determined was not available for appropriation under subsection 17(b).[53] According to the Council, the sole distinction is that the HEIF was created as an endowment fund while the other funds were created as "accounting entr[ies] within the general fund until the monies were ultimately disbursed, following an appropriation, for one project or another."

In *Cowper* we held that "the 'amount available for appropriation' within the meaning of article IX, section 17 of the Alaska Constitution includes all monies over which the legislature has retained the power to appropriate and which require further appropriation before expenditure."[54] We noted that the "key question" was "what constitutes a valid appropriation such that the funds involved are no longer available."[55] We explained that "one of the fundamental characteristics of an appropriation, in the public law context, is that it authorizes governmental expenditure without further

---

[51] *Id.* at 930-31 & 931 n.20.

[52] *See id.* at 933-34 (holding Railbelt energy, Alaska marine highway system vessel replacement, and educational facilities maintenance and construction were funds available for appropriation).

[53] *See id.* at 933.

[54] *Id.* at 935.

[55] *Id.* at 932.

legislative action."[56] We then applied that definition to several accounts that had been established as "restricted" funds within the general fund and consisted of money appropriated to them by the legislature.[57] We explained that the "initial appropriations . . . [were] not sufficient to support any expenditure" and that further appropriations were necessary.[58] The funds were thus available for appropriation under subsection 17(b).[59]

The same analysis applies in this case. The HEIF was funded with an initial $400 million appropriation[60] and continues to be funded with appropriations.[61] But the legislature then must appropriate HEIF money into the Education Grant and Performance Scholarship award accounts; once the second appropriations are made, the programs may expend the funds.[62] And contrary to the Legislative Council's argument, the HEIF is unlike the oil and hazardous substance release response fund; because the Department

---

[56]     *Id.* at 933.

[57]     *Id.*

[58]     *Id.*

[59]     *Id.* at 934 ("Because the initial 'appropriations' to these funds cannot support any expenditure, the money in these funds remains 'available for appropriation' until further appropriations are made.").

[60]     *See* ch. 5, § 20(f), FSSLA 2011 ("The sum of $400,000,000 is appropriated . . . to a fund created for the purpose of providing education grants or performance scholarships, or both, by the Twenty-Seventh Alaska State Legislature."); ch. 74, § 27, SLA 2012 ("The Alaska higher education investment fund established in AS 37.14.750, enacted by sec. 13 of this Act, is the fund identified in sec. 20(f), ch. 5, FSSLA 2011.").

[61]     *See* AS 37.14.750(a) ("The [HEIF] consists of (1) money appropriated to the fund . . . .").

[62]     *Id.*; AS 14.43.915(a), (b). As noted earlier, the legislature may appropriate HEIF money to fund additional programs, such as it did with WWAMI and Live Homework Help.

of Environmental Conservation's commissioner is statutorily authorized to expend money in that fund without further legislative involvement, the fund is not available for appropriation.[63] But the Executive Branch is *not* authorized to spend monies from the HEIF to fund programs without further legislative appropriations. For these reasons, the HEIF is "available for appropriation" under the test we articulated in *Cowper*. Because further appropriations are necessary to support expenditures, the HEIF is available for appropriation under the *Cowper* analysis.

The Students and the Legislative Council nonetheless assert that the HEIF is not available for appropriation under *Cowper* because it already has been appropriated and expended to purchase "a customized well-diversified portfolio" of investments. The Legislative Council contends that "[a]s an endowment, there was and is no need for further appropriation to complete the expenditure that the Legislature intended when it funded the HEIF." The Council argues that under the HEIF's endowment model, "the initial appropriation into the HEIF and the subsequent purchase of these non-cash assets *was* itself an expenditure," whereas the other funds merely are "a place where monies are parked until they are ultimately spent on a project." The Legislative Council asserts that, at most, the annual 7% "actually appropriated" from the HEIF would be available for appropriation because at that point it is "appropriated from the excluded HEIF to another purpose." In contrast, the Students concede that "[t]he legislature can always appropriate more or less than 7% from the HEIF, including for other purposes."

The Students' and the Legislative Council's assertion that the HEIF has already been appropriated and thus is unavailable for appropriation is unpersuasive. The fact that the HEIF already has been invested is irrelevant because the monies in the

---

[63]    *See Cowper*, 874 P.2d at 933; *see also* AS 46.08.040 (authorizing commissioner of environmental conservation to spend money from oil and hazardous substance release response fund).

HEIF, by statute, must be further appropriated to be spent.[64] As the Executive Branch correctly points out, most state monies are invested,[65] including the three funds we determined were available for appropriation in *Cowper*.[66] Purchasing investment assets was not a final expenditure such that no further legislative appropriations were necessary, because the entirety of the HEIF remains available to be spent by the legislature through appropriations.[67] If the HEIF's corpus already were expended, then it would not be available to appropriate for further expenditures because, logically, the same money cannot be spent twice. Expenditures cannot be made from the HEIF without further legislative appropriation; it thus is available for appropriation.

The Students counter that "the legislature always retains the ability to re-appropriate funds to a new public purpose until the monies have actually been expended, including appropriations for the current fiscal year." (Emphasis omitted.) The Students provide an example: The legislature could pass the budget for fiscal year 2023 appropriating $100 million for the court system, then cut the budget in the first several months of the fiscal year before the money is spent. But this example is distinguishable from the HEIF. The court system would be free to spend from its $100 million

---

[64]     AS 37.14.750(a).

[65]     *See* AS 37.10.070(a) ("The commissioner [of revenue] shall invest . . . the money in the state treasury above an amount sufficient to meet immediate expenditure needs.").

[66]     *Cowper*, 874 P.2d at 933-34; *see* AS 37.05.560(b) ("The educational facilities maintenance and construction fund shall be invested by the Department of Revenue so as to yield competitive market rates . . . ."); AS 37.05.520 ("The [D]epartment of [R]evenue shall manage the [Railbelt energy] fund."); AS 37.05.550(a) ("The Department of Revenue shall manage the [Alaska marine highway system vessel replacement] fund.").

[67]     *See* AS 37.14.750.

appropriation in the months before the legislature's budget cut passed. By contrast, before any part of the initially appropriated HEIF funds may be spent for scholarship programs, grant accounts, or another purpose, the legislature must make an appropriation to authorize that spending.

In short, the HEIF is sweepable under the *Cowper* analysis of subsection 17(b).

### 2. *Cowper* applied the same "available for appropriation" definition to subsection 17(d) and held that certain restricted funds were available for appropriation under subsection 17(d).

A major point of contention between the parties is whether our statement in a *Cowper* footnote that we saw "no reason" to define "available for appropriation" differently in subsections 17(b) and (d) was a holding or dictum.[68] The Students contend that *Cowper*'s "available for appropriation" analysis concerned only subsection 17(b) and that we did not undertake a constitutional analysis of subsection 17(d). The Students further assert that we "did not account for the temporal differences between [sub]sections 17(b) and 17(d)" or "analyze the framers' intent and voters' understanding."

The Students are incorrect that our statement regarding subsection 17(d) was dictum. In *Cowper* we intentionally construed "available for appropriation" as having the same meaning in subsections 17(b) and (d), and this was a key part of our holding. We specifically analyzed AS 37.10.420(b)'s constitutionality, which addresses subsection 17(d), and we held it unconstitutional; we cited the fact that, like the legislature's attempted statutory definition of "available for appropriation" as used in

---

[68] *Cowper*, 874 P.2d at 936 n.32; *see Holding*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining term as "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision"); *Dictum*, BLACK'S LAW DICTIONARY (11th ed. 2019) (noting judicial dictum is "an opinion . . . not essential to the decision and therefore not binding even if it may later be accorded some weight").

subsection 17(b), the statutory definition of the phrase in subsection 17(d) improperly "exclude[d] restricted funds within the general fund."[69]  Although we noted that the definition of "available for appropriation" as used in subsection 17(b) was the "primary issue,"[70] we confirmed that we were analyzing the phrase "within the meaning of article IX, section 17 of the Alaska Constitution" as a whole.[71]

As the Executive Branch notes, the subsection 17(d) statutory definition of "available for appropriation" that we struck down as unconstitutional was almost identical to the definition the Students ask us to adopt.  The unconstitutional statute provided in part:

> If the amount appropriated from the [CBR] has not been repaid under [subsection 17(d)], the Department of Administration shall transfer to the [CBR] the amount of money comprising the *unreserved, undesignated general fund balance* to be carried forward as of June 30 of the fiscal year, or as much of it as is necessary to complete the repayment.[72]

To compare, the Students argue that under subsection 17(d) sweepable funds are limited to: "surplus, leftover, unobligated general funds remaining at the end of each succeeding fiscal year"; "unappropriated, unobligated, surplus general fund monies"; or "remaining unrestricted surpluses in the general fund at the end of each fiscal year." (Emphasis omitted.)  The Students' subsection 17(d) interpretation cannot be reconciled with our

---

**69**     *Cowper*, 874 P.2d at 936.

**70**     *Id.* at 926; *see also Wielechowski v. State*, 403 P.3d 1141, 1151 n.66 (Alaska 2017) (correcting *Cowper*'s brief comment about permanent fund and describing *Cowper* as being about meaning of "available for appropriation" in subsection 17(b)).

**71**     *Cowper*, 874 P.2d at 935.

**72**     AS 37.10.420(b) (emphasis added); *see Cowper*, 874 P.2d at 936.

*Cowper* holding that certain restricted funds within the general fund remain available for appropriation under subsection 17(d).

### 3. Including "amounts actually appropriated" in subsection (b) does not affect the subsection (d) definition.

In *Cowper* we defined "available for appropriation" under subsection 17(b) as including two types of money: (1) "all monies over which the legislature has retained the power to appropriate and which require further appropriation before expenditure" and (2) "all amounts actually appropriated, whether or not they would have been considered available prior to appropriation."[73] The Students and the Executive Branch agree that the definition's second part cannot logically apply to subsection 17(d); if it did, "all appropriations — including those for the current fiscal year — would be swept." (Emphasis omitted.) The Students contend that because both parts of subsection 17(b)'s "available for appropriation" definition cannot apply, the entire definition does not apply and the subsection 17(d) holding is either wrong or dictum. The Executive Branch counters by asserting that *Cowper* is "obviously and logically intended" to be read with only the definition's first part applying to subsection 17(d) because the "all amounts actually appropriated"[74] adjustment is relevant only to subsection 17(b).

Subsection 17(b) requires comparing the "amount available for appropriation for a fiscal year" to the "amount appropriated for the previous fiscal year" to determine whether the CBR may be accessed to make up for a budget shortfall.[75] In *Cowper* we reasoned that the "amount available for appropriation" in subsection 17(b) "necessarily includes all amounts which are in fact appropriated for a fiscal year,

---

[73] *Cowper*, 874 P.2d at 935.

[74] *Id.*

[75] Alaska Const. art. IX, § 17(b).

including 'trust receipts' " because "nothing in the text or history of section 17 . . . would justify classifying money actually appropriated as *unavailable* for appropriation."[76] We noted that it made sense to include trust receipts in the amount available for appropriation because "appropriations made from these receipts represent a significant portion of state spending"[77] and including trust receipts in the comparison would ensure that "for example, declines in federal funding might result in increased access to the [CBR]."[78] We ultimately concluded that regardless of policy arguments, "the text of [sub]section 17(b) clearly requires that all funds which are in fact appropriated be counted as 'available for appropriation.' "[79]

Subsection 17(d), in contrast, requires no year-to-year comparison of available funds.[80] The Executive Branch is correct that the "amounts actually appropriated" adjustment is relevant only to subsection (b) and that *Cowper* can and should be read as not applying the adjustment to subsection (d). *Cowper* stated that when applying "available for appropriation" to particular funds the "key question" was "what constitutes a valid appropriation such that the funds involved are no longer

---

[76]  *Cowper*, 874 P.2d at 931 (emphasis in original). We defined "trust receipts" as including "all funds, whatever the source, which the State can . . . use [only] for a specific stated purpose under applicable law" and noted "[t]he largest 'trust receipt' category is federal funding." *Id.* at 931 n.22.

[77]  *Id.* at 931.

[78]  *Id.* at 932. On the comparison's other side, the "amount appropriated for the previous fiscal year" "includes every dollar appropriated by the legislature, whatever its source." *Id.* at 935. Including all amounts actually appropriated in the "amount available for appropriation" ensures "symmetry in the comparison." *Id.*

[79]  *Id.* at 932.

[80]  Alaska Const. art. IX, § 17(d).

available."[81]  As discussed above, we reasoned that a fundamental characteristic of an appropriation is "authoriz[ing] governmental expenditure without further legislative action"; using that definition we determined that certain funds requiring further legislative appropriations before expenditures can be made were "available for appropriation."[82]  Nowhere in our analysis of which specific funds were available for appropriation did we apply or discuss the "amounts already appropriated" adjustment.[83]  Our statements that "all amounts actually appropriated . . . are available within the meaning of section 17" and that we saw "no reason to give 'available for appropriation' a different meaning in subsection (d) than we did in subsection (b)" must be understood within the decision's context as a whole;[84] the "all amounts actually appropriated" adjustment is necessary in light of subsection 17(b)'s text but is irrelevant to subsection 17(d).

### 4. Our determination that the HEIF is sweepable does not present a separation of powers issue.

The Students next contend that interpreting subsection 17(d) to include the HEIF as a sweepable fund would violate the separation of powers doctrine.  The separation of powers doctrine "limits the authority of each branch [of government] to interfere in the powers that have been delegated to the other branches."[85]

---

[81]  *Cowper*, 874 P.2d at 932.

[82]  *Id.* at 933-34.

[83]  *See id.*

[84]  *Id.* at 935, 936 n.32.

[85]  *State v. Recall Dunleavy*, 491 P.3d 343, 367 (Alaska 2021) (quoting *Alaska Pub. Int. Rsch. Grp. v. State*, 167 P.3d 27, 35 (Alaska 2007)).

The Alaska Constitution "gives the legislature the power to legislate and appropriate."[86] The Students suggest that sweeping the HEIF into the CBR "would be a radical, new, and unconstitutional infringement on the legislature's appropriation power." The superior court dismissed the Students' separation of powers argument:

> [The Students] also argue there is a separation of powers issue pursuant to Article IX, section 13 of the Alaska Constitution[87] based on [the Executive Branch's] interpretation of [sub]section 17(d). S[ubs]ection 17(d) is a constitutional directive which was approved by Alaska voters. . . . . Any statutes which apply to [sub]section 17(d) must conform to the language and directive of the constitutional provision. Because the Executive Branch performed a valid sweep of funds, there cannot be a conflict creating a separation of powers question.

The superior court was correct. Contrary to the Students' assertions, sweeping the HEIF into the CBR does not render the appropriations into the HEIF void because the HEIF is constitutionally required to be swept into the CBR. The plain text of subsection 17(d) requires that "money in the general fund available for appropriation at the end of each succeeding fiscal year shall be deposited in the [CBR]" until the

---

[86]     *Alaska Legis. Council v. Knowles*, 21 P.3d 367, 371 (Alaska 2001) (footnote omitted); *see* Alaska Const. art. IX, § 12 (requiring governor to submit next fiscal year's budget to legislature with general appropriation bill authorizing expenditures).

[87]     Article IX, section 13 of the Alaska Constitution states: "No money shall be withdrawn from the treasury except in accordance with appropriations made by law. No obligation for the payment of money shall be incurred except as authorized by law. Unobligated appropriations outstanding at the end of the period of time specified by law shall be void."

amount appropriated from the CBR is repaid.[88] And we interpreted money "available for appropriation" to include funds such as the HEIF, as discussed above.[89] The CBR amendment is a valid limit on the legislature's power, adopted by the Alaska voters.[90] The separation of powers doctrine is thus not violated by the Executive Branch following the constitutional mandate to sweep the HEIF into the CBR.

### B.    We Decline To Overrule *Cowper*.

Finally, the Students argue that if we conclude *Cowper* requires us to find the HEIF is available for appropriation under subsection 17(d) and thus subject to the sweep, we should overrule *Cowper*. "[T]he importance of stare decisis cannot be overstated:   '[S]tare decisis is a practical, flexible command that balances our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands.' "[91] A party seeking reversal has "a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling."[92] We consider overturning a prior decision only if we are clearly convinced that (1) "the

---

[88]    Alaska Const. art. IX, § 17(d).

[89]    *See Cowper*, 874 P.2d at 933-34, 936 (holding funds that require "[f]urther legislative appropriations" are "available for appropriation" and thus are sweepable).

[90]    *See Hickel v. Halford*, 872 P.2d 171, 177 & n.9 (Alaska 1994) (describing Article IX, section 17 as voters' "response to a perceived impending fiscal crisis resulting from a growing gap between State spending levels and general fund revenues" intended "to remove certain unexpected income from the appropriations power of the legislature[] and to save that income for future need").

[91]    *Meyer v. Alaskans for Better Elections*, 465 P.3d 477, 495 (Alaska 2020) (second alteration in original) (quoting *Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1175 (Alaska 1993)).

[92]    *Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 943 (Alaska 2004).

rule was originally erroneous or is no longer sound because of changed conditions" and (2) "more good than harm would result from a departure from precedent."[93] "[A] decision is 'originally erroneous' if (1) it 'proves to be unworkable in practice' or (2) we failed to address relevant points and the party can show that it 'would *clearly* have prevailed if the points had been fully considered.' "[94]

The Students contend that *Cowper* was originally erroneous. They assert that we "failed to address relevant points" because subsection 17(d)'s interpretation was not before us in *Cowper*, we did not evaluate which funds should be subject to the sweep, and we did not analyze subsection 17(d)'s plain language or purpose. We disagree. As discussed above, in *Cowper* we extensively analyzed the meaning of "available for appropriation" and intentionally applied this definition to subsection 17(d).

The Students also cannot show that they "would *clearly* have prevailed if the points had been fully considered"[95] because *Cowper* properly interpreted "available for appropriation" as used in subsection 17(d).[96] We begin with the presumption that the same word or phrase — "available for appropriation" — was used consistently throughout section 17.[97] The Students and the Executive Branch agree that including

---

[93]     *Id.*

[94]     *Khan v. State*, 278 P.3d 893, 901 (Alaska 2012) (emphasis in original) (quoting *Thomas*, 102 P.3d at 943).

[95]     *See id.* (emphasis in original) (quoting *Thomas*, 102 P.3d at 943).

[96]     *Hickel v. Cowper*, 874 P.2d 922, 935 (Alaska 1994).

[97]     *See Forrer v. State*, 471 P.3d 569, 585 (Alaska 2020) ("Terms and phrases chosen by the framers are given their ordinary meaning as they were understood at the time, and usage of those terms is presumed to be consistent throughout." (footnote omitted)); *id.* at 597 ("The presumption of consistent usage, which states that words are
(continued...)

"amounts actually appropriated" in our formulation of "available for appropriation" under subsection 17(b) does not logically apply to subsection 17(d).[98] But, as explained above, that does not mean the entire "available for appropriation" definition developed in *Cowper* must be disregarded for subsection 17(d). The phrase, used twice in section 17 just sentences apart, still must be construed as consistently as possible.[99]

The Students argue that section 17's drafting history and underlying policies, along with voters' likely understanding of the section, clearly justify deviating from *Cowper*'s determination that restricted funds within the general fund are available for appropriation under subsection 17(d). The Students concede that subsection 17(d)'s legislative history is sparse "because its language was added on the House floor at the tail end of the 1990 legislative session." But the Students point to a statement by Senator Jan Faiks about Senate Joint Resolution 5 (S.J.R. 5), an initial draft of the bill creating the CBR, in which the Senator noted that section 17 targeted "unrestricted general funds."[100] But in *Cowper* we specifically rejected the notion that only unrestricted general funds were "available for appropriation" under subsection 17(b).[101] As the Students themselves point out, S.J.R. 5 "was completely rewritten through an amendment

---

[97]    (...continued)
'presumed to bear the same meaning throughout a text,' is not a canon of construction we cast aside lightly — especially when those terms appear multiple times within the same article." (footnote omitted) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012))).

[98]    *See Cowper*, 874 P.2d at 935.

[99]    *See Forrer*, 471 P.3d at 585, 597.

[100]    *See* Minutes, Sen. Fin. Comm. Hearing on S.J.R. 5, 16th Leg., 2d Sess. (Feb. 2, 1990) (statement of Senator Jan Faiks).

[101]    *See Cowper*, 874 P.2d at 933-34.

on the floor of the House on May 8, 1990" and "only one short statement explained what would later become [sub]section 17(d)." The only sponsor statement the Students cite about the House amendment explained that under subsection 17(d) the CBR "would be repaid . . . out of any general fund surpluses that remain at the end of a fiscal year."[102] (Emphasis omitted.) But this statement on its own does not compel the result the Students seek; it does not answer whether unspent restricted funds within the general fund count as "surplus." Subsection 17(d)'s limited legislative history is not compelling enough to overcome the presumption that the same phrase should be construed as consistently as possible throughout a statute or constitutional provision.[103]

The Students argue that section 17 was intended by its drafters and understood by the voters who approved it to be a budget-stabilizing mechanism. The Executive Branch points out that the stabilizing mechanism intended by section 17 is not preserving long-term funds but rather preserving Alaska's long-term solvency and financial flexibility. As the Executive Branch states, it would not be consistent with the CBR amendment's purpose if "all the legislature has to do is label a statutory savings account with a possible future use to exempt the funds in the account from being used to meet the repayment obligation." The legislature cannot have its cake and eat it too: It would be inconsistent with the CBR amendment's language and purpose to allow the legislature to retain control of appropriations such that money in the HEIF must be further appropriated before being spent, but at the same time claim that the money is not

---

[102] *See* Statement of Representative Kay Brown at 1:02:50-1:03:08, House Floor Session on S.J.R. 5, 16th Leg., 2d Sess., (May 8, 1990), http://www.akleg.gov/ftr/archives/1990/HFLR/121-HFLR-900508-2.mp3 ("If money is borrowed, or appropriated from the [CBR] in that manner, or any money taken out of it, [it] would be repaid to the [CBR] out of any general . . . fund surpluses that remain at the end of a fiscal year.").

[103] *See Forrer*, 471 P.3d at 585, 597.

available for appropriation. The Executive Branch is correct that "[t]he HEIF — which is funded far beyond any expected annual scholarship need — is every bit as 'surplus' as unrestricted general fund money." This is consistent with the voters' probable understanding that surplus general fund money would be swept into the CBR.[104]

For these reasons the Students also cannot show that more good than harm would result from reversing *Cowper*.[105] *Cowper*'s holding that "available for appropriation" under subsection 17(d) includes some restricted funds from which further legislative appropriations are required before expenditures can be made is consistent with the purpose behind the amendment and the framers' preference that "control of and responsibility for state spending" be preserved "in the legislature and the governor."[106] As the Executive Branch notes, interpreting "available for appropriation" in the very way that the term was defined in the statute *Cowper* ruled unconstitutional would undermine the CBR amendment's purpose and "essentially write [sub]section 17(d) out of the amendment." We decline to overrule *Cowper*.

## VI. CONCLUSION

The superior court's decision is AFFIRMED.

---

[104] *See* 1990 Ballot Measure No. 1, Leg. Affairs Agency Summary ("Surplus general fund money must be deposited in the reserve fund at then end of each year . . . .").

[105] *See Meyer v. Alaskans for Better Elections*, 465 P.3d 477, 495 (Alaska 2020).

[106] *Sonneman v. Hickel*, 836 P.2d 936, 938 (Alaska 1992).